# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 15-1280

CONLEY F. MONK, JR., ET AL.,                                        PETITIONERS,

     V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS,                                       RESPONDENT.


Before DAVIS, *Chief Judge*, and SCHOELEN, PIETSCH, BARTLEY, GREENBERG, ALLEN, MEREDITH, and TOTH, *Judges.*[1]

## O R D E R

Opinions En Banc

The motion for class certification is denied by an equally divided en banc Court. The opinions that follow reflect the views of the participating judges.


SCHOELEN, *Judge*, with whom DAVIS, *Chief Judge*, PIETSCH, and MEREDITH, *Judges*, join concurring:

## I. BACKGROUND

On April 6, 2015, Conley F. Monk, Jr., filed a petition with the Court for extraordinary relief in the nature of a writ of mandamus. The petition sought an order from the Court directing the Secretary to decide certain appeals within 1 year after a Notice of Disagreement (NOD) was submitted. The petitioner filed the petition on behalf of himself and similarly situated persons facing financial and medical hardship. The petition alleged that the Secretary's delay in adjudicating claims for disability compensation benefits, which are pending an administrative appeal before VA, constitutes a violation of the right to due process under the Fifth Amendment to the U.S. Constitution. Additionally, the petition alleged that the Secretary's delay in adjudicating disability compensation claims amounts to an arbitrary refusal to act. The petition requested that the Court grant relief to an aggregate group pursuant to the principles of Rule 23 of the Federal Rules of Civil Procedure (Rule 23). The Court interpreted this request as a motion for a class action.

---

[1] Judge Falvey did not participate in this matter because it was assigned to the full-Court and oral argument was held before his appointment to the Court. *See* U.S. VET. APP. INTERNAL OP. P. sec. VII(b)(1)(B).

Regarding the request for class relief, the Court denied the petition on the ground that the Court did not have the authority to adjudicate class claims. The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) reversed the decision and remanded the matter for further proceedings. *Monk v. Shulkin*, 855 F.3d 1312 (Fed. Cir. 2017). The Court determined to consider the remanded matter en banc.

On January 12, 2018, the Court granted the petitioner's "Amended Motion for Leave to File an Amended Petition for Extraordinary Equitable and Collective Relief and Join Additional Petitioners" (Amended Petition). The Amended Petition expands the proposed class by removing the condition that the proposed class be limited to veterans facing medical or financial hardship. Additionally, the Amended Petition joins eight additional petitioners to this action.[2] The petitioners have defined the proposed class as consisting of all individuals who applied for and have been denied VA disability compensation benefits and have not received a decision from the Board of Veterans' Appeals (Board) within 12 months of the date of filing a timely NOD.[3] Finally, the Amended Petition adds a new basis to support the argument that a writ of mandamus is necessary to correct the Secretary's delay in adjudicating disability claims pending on appeal.

On March 5, 2018, the en banc Court held oral argument on the issue of class certification. The Court will address this issue and will not make any findings on the underlying merits of the Amended Petition. The Court anticipates that, at some point, it will adopt a rule on aggregate procedures that is appropriate for this Court. However, until that time, the Court will use Rule 23 of the Federal Rules of Civil Procedure as a guide.

## II. ANALYSIS

### A. The Court's Authority To Decide Aggregate Actions in Petitions for Writs of Mandamus

It is well settled that this Court has authority pursuant to the All Writs Act, 28 U.S.C. § 1651, to issue extraordinary relief in the form of a writ of mandamus. *See Erspamer v. Derwinski*, 1 Vet.App. 3, 7-8 (1990).[4] Further, this Court has long since recognized that the Court's jurisdiction under the All Writs Act "extends beyond pending cases; it embraces the prospective and potential jurisdiction" of those cases that are within its appellate jurisdiction although no appeal has been perfected. *Id.*; *see Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25 (1943).

The Federal Circuit held that the All Writs Act also authorizes this Court to aggregate cases in the context of a petition for extraordinary relief in the form of a writ of mandamus. *Monk*, 855 F.3d at 1318.[5] The Federal Circuit also recognized that other statutory provisions grant the

---

[2] These petitioners are James Briggs, Tom Coyne, William Dolphin, Jimmie Hudson, Samuel Merrick, Lyle Obie, Stanley Stokes, and William Jerome Wood II.

[3] At oral argument, the petitioners clarified that the decisions referred to in the petition and Amended Petition are Board decisions.

[4] The Court does not address the Court's authority to aggregate proceedings as part of its review of a final Board decision.

[5] In *Harrison v. Derwinski*, the Court denied an appellant's petition to establish class action procedures because (1) the Court lacked authority to adopt class action procedures; (2) class action procedures would be "highly unmanageable"; and (3) class actions are "unnecessary" because of the binding effect of the Court's precedential

2

Court authority to aggregate claims, including 38 U.S.C. § 7264(a), which specifically provides the Court express authority to create rules and procedures it needs to exercise its jurisdiction, and 38 U.S.C. § 7261(a)(2), which expressly provides the Court the power to "compel action of the Secretary unlawfully withheld or unreasonably delayed." Because Congress did not restrict section 7261(a)(2) to individual petitions, the Federal Circuit concluded that this Court may aggregate petitions for extraordinary relief. *Monk*, 855 F.3d at 1320.

The Court has authority to conduct limited factfinding, for example, to determine whether to equitably toll the Court's time limit to file a Notice of Appeal. *See Dixon v. Shinseki*, 741 F.3d 1367, 1377 (Fed. Cir. 2014) ("Because the period relevant to the equitable tolling inquiry occurs *after* the [B]oard has rendered a final decision . . . , the Veterans Court must frequently 'seek facts outside the record before the Board' in evaluating whether equitable tolling is warranted." (quoting *Bove v. Shinseki*, 25 Vet.App. 136, 143 (2011) (per curiam order) ("[T]his Court . . . may seek facts outside the record before the Board and independently weigh the facts to determine if equitable tolling is appropriate."))), *overruled on other grounds*, *Dixon v. McDonald*, 815 F.3d 799 (Fed. Cir. 2016).[6] When considering the merits of a petition for extraordinary relief, the Court has long considered facts that were not before the Board. *See Erspamer*, 1 Vet.App. at 10.

This Court also concludes that it has authority to conduct limited factfinding to determine whether class certification is warranted. An integral part of the Court's exercise of its authority to issue writs on an aggregate basis includes the authority to conduct the limited factfinding needed to decide whether the petitioners and putative class members satisfy this Court's requirements to certify a class and to further decide the merits of the underlying petition. Accordingly, limited factfinding in the context of class certification in petitions for extraordinary relief does not run afoul of the prohibition of section 7261(c) that the Court shall not make de novo findings of fact when it reviews the merits of a final Board decision.

### B. VA Claims Adjudication and Appeals Process

To fully address the certification issue, the Court begins by examining the VA claims adjudication and appeals processes. The Veterans Benefits Administration (VBA) is the branch of VA that is responsible for operating various veterans benefits programs and services, including disability compensation. Under the disability compensation program, veterans with disabilities that are the result of a disease or injury incurred in, or aggravated during, active military service are entitled to monetary benefits as compensation. *See* 38 U.S.C. § 1110; 38 C.F.R. § 3.303 (2018).

---

decisions in pending and future cases. 1 Vet.App. 438, 438-39 (1991) (en banc order). In *Monk*, the Federal Circuit expressly overturned the first ground of *Harrison*, that is, the Federal Circuit disagreed that this Court lacks authority to adopt class action procedures. 855 F.3d at 1320 (citing *Harrison*, 1 Vet.App. at 438) ("We disagree that the . . . Court's authority is so limited."). Here, given that the Court will deny the petitioners' motion for class certification because, for reasons explained below, the proposed class does not meet Rule 23's commonality standard, the Court need not at this time decide whether *Harrison*'s manageability and necessity grounds are appropriate considerations for class certification.

[6] Additionally, this Court has authority to make factual findings over ancillary matters. *See, e.g.*, *Golden v. Gibson*, 27 Vet.App. 1, 9 (2014) (determining whether an attorney fee agreement is "*excessive or unreasonable*" under 38 U.S.C. § 7263(d) (emphasis added)); *Harvey v. Shinseki*, 24 Vet.App. 284, 287 (2011) (per curiam order) (stating that the Court may make findings of fact in deciding whether holding a party in contempt is warranted).

Generally, to establish entitlement to service-connected disability compensation, "the veteran must show: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service." *Shedden v. Principi*, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

Once a disability is service connected, VA assigns a disability rating based on a schedule of ratings for specific injuries and disabilities. Generally, VA applies the criteria established in the pertinent diagnostic code in the disability rating schedule and assigns a disability rating for the service-connected injury or illness. Different mental and physical injuries and diseases are rated on a scale of 0 to 100%, in 10% increments. The disability ratings are based on the average diminished earning capacity attributed to the service-connected disease or injury.[7]

The VA regional office (RO) also assigns an effective date for the award of service-connected disability benefits. Generally, the effective date of an original claim or a reopened claim is the date of the claim or the date entitlement arose, whichever is later. 38 U.S.C. § 5110(a). However, after a decision on a claim has become final within VA, a veteran may file a request for revision of the prior decision based on clear and unmistakable error (CUE). If the veteran establishes that there was CUE in the RO decision, then the RO decision will be revised, meaning that the request for revision may result in an earlier effective date. *See Cook v. Principi*, 318 F.3d 1334, 1339 (Fed. Cir. 2002) (en banc); *see also* 38 U.S.C. § 5109A. Additionally, a finally disallowed claim may be reopened based upon new and material evidence. 38 U.S.C. § 5108 ("If new and material evidence is presented or secured with respect to a claim which has been disallowed, the Secretary shall reopen the claim and review the former disposition of the claim.").

Applying for benefits from the VBA begins at one of the 56 ROs located throughout the United States. After receiving the claim, VA has a statutory duty to assist a veteran in developing evidence in support of his or her claim. 38 U.S.C. § 5103A. The duty to assist requires VA to undertake "reasonable efforts" to seek all government records that may pertain to the claim, including service personnel and medical records, VA medical records, and Social Security Administration records. 38 U.S.C. § 5103A(c). VA is required to attempt to obtain records from a Federal department or agency until it is reasonably certain that the records do not exist or that any further efforts to obtain the records would be futile. 38 U.S.C. § 5103A(c)(2); 38 C.F.R. § 3.159(c)(2) (2018). When the Secretary is unable to obtain the records sought, the Secretary is required to notify the claimant.[8] 38 C.F.R. § 3.159(e)(1). The duty to assist also requires VA to acquire non-Federal records, including private medical records that the claimant adequately

---

[7] The percentage of a disability rating assigned to a veteran is "considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability." 38 C.F.R. § 4.1 (2018).

[8] The notice provided must (1) identify the records that the Secretary was unable to obtain, (2) briefly describe the efforts the Secretary made to obtain the records, and (3) describe any further action that the Secretary will take with respect to the claim. 38 U.S.C. § 5103A(b)(2)(A). Furthermore, if the Secretary determines that continued searching for service records would be futile, the Secretary is required to explain to the claimant how service records are maintained, why the search that was undertaken constitutes a reasonably exhaustive search, and why further efforts (e.g., inquiries directed to the named facilities, if they are still operational) are not justified. *See Godwin v. Derwinski*, 1 Vet.App. 419, 425 (1991).

identifies and authorizes VA to obtain. 38 U.S.C. § 5103A(b); *see* 38 C.F.R. § 3.159(c)(1). For private records, VA must make "an initial request for the records and, if the records are not received, at least one follow-up request." 38 C.F.R. § 3.159(c)(1). If VA determines that those records are unavailable, VA must notify the claimant of their unavailability. 38 U.S.C. § 5103A(b)(2)(A).

Because many of the issues in adjudicating disability compensation claims involve medical questions, VA's duty to assist also includes "providing a medical examination or obtaining a medical opinion when such an examination or opinion is necessary to make a decision on the claim." 38 U.S.C. § 5103A(d). In a service-connection claim, a medical examination may affirm that a disability exists and include an opinion regarding the relationship of the current disability to the veteran's military service. In a rating-increase claim, a medical examination may describe the nature and severity of the veteran's service-connected disability.

Once evidence in support of a veteran's claim has been gathered, the RO makes a decision on the claim. If a veteran disagrees with the RO decision, he or she may appeal to the Board. An appeal is a two-step process. The first step begins when a veteran files an NOD. An NOD may be filed within 1 year after the RO's decision is mailed. The veteran may appeal the denial of service connection, the percentage of the disability rating assigned to the disability, or the effective date of the disability.

After an RO receives an NOD from a veteran, it sends the veteran an election letter asking the veteran to choose between two nonexclusive appeals processes: (1) De novo review of his or her claim by a decision review officer (DRO) (a senior ratings specialist), who is authorized to hold a hearing and reverse the initial rating decision; or (2) a traditional appeal to the Board. *See* 38 U.S.C. § 7105(d). If the veteran elects de novo review by a DRO, and that officer resolves some, but not all issues on appeal, or if the officer fails to resolve the appeal, a Statement of the Case (SOC) will be prepared providing a more detailed rationale for the underlying ratings decision. If the veteran elects the traditional appeal, an SOC will be issued. VA's duty to assist continues throughout the appeals process, as VA is required to "take such development or review action as it deems proper" to resolve the disagreement. 38 U.S.C. § 7105(d); *see Prickett v. Nicholson*, 20 Vet.App. 370, 377 (2006) (stating that "[t]he VA adjudicatory system is designed to afford both the claimant and the Government every opportunity to resolve a disagreement between the parties").

If the veteran chooses to continue to pursue an appeal to the Board, he or she proceeds to the second step of the appeal process by filing a VA Form 9 within 60 days of receiving the RO's SOC, or within the remainder of the 1-year appeal period that begins when the veteran receives the RO's decision, whichever is later. *See* 38 U.S.C. § 7105(d)(3). After a VA Form 9 is filed, the RO must then certify the veteran's appeal to the Board. 38 C.F.R. § 19.35 (2018). Before the Board makes a decision on a claim, the veteran is entitled to a hearing before the Board. 38 U.S.C. § 7107(b).[9]

---

[9] This is a description of the existing VA adjudication and appeals process. Congress recently enacted the Veterans Appeals Improvement and Modernization Act of 2017, 115 Pub. L. No. 55, 131 Stat. 1105 (Aug. 23, 2017), which will modify this process. Because this modification is not yet in place, we do not comment on class actions under the new statutory scheme.

## C. Class Certification Under Rule 23

As stated above, in this case the Court will use Rule 23 of the Federal Rules of Civil Procedure as a guide for considering whether to grant the petitioners' motion for class certification. Class relief is appropriate when the class shares issues that are common to the class as a whole and when the questions of law apply in the same manner to each class member. *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979). In such cases, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion." *Id.*

Rule 23 governs class certification. To justify certification, each of the elements of Rule 23(a) must be met. *See Amchem Products., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 529 (D.C. Cir. 2006). The party seeking class action bears the burden of proving that the requirements of the class certification rule have been met. *Amchem*, 521 U.S. at 614; *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

The certifying court must rigorously analyze the Rule 23 prerequisites before certifying a class. *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim [and this] cannot be helped" because "'[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the . . . cause of action.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (quoting *Falcon*, 457 U.S. at 160 (internal quotation marks omitted)). The four prerequisites to certify a class action under Rule 23(a) are the following:

> 1. Numerosity: The class is so numerous that joinder of all members is impracticable;
> 2. Commonality: There are questions of law or fact common to the class;
> 3. Typicality: The claims or defenses of the representative parties are typical of the claims and defenses of the class; and
> 4. Adequacy: The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Additionally, the proponents of class certification must demonstrate that the class is maintainable under one of the subdivisions of Rule 23(b). *See Amchem*, 521 U.S. at 614. Here, the petitioners argue that the class should be certified pursuant to Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Petitioners' Response to Court's October 2017 Order at 20 (Pet.'s Response).

## D. Commonality

The crux of this case is commonality, Rule 23(a)'s requirement that there be questions of law or fact common to the class as a whole. In *Wal-Mart*, 564 U.S. at 349-50, the U.S. Supreme Court held that a proposed class must demonstrate that the class members suffer the same injury. In proving this element, it is not sufficient that all class members suffer from a violation of the

6

same provision of law. *Id.* at 350. Rather, the certifying court must be convinced that the claims of every class member "depend upon a common contention, . . . . that . . . is capable of classwide resolution[, meaning that the contention is of such a nature] . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

*Wal-Mart* makes clear that class certification depends not only on common questions but also on the capability of a class action proceeding to provide common answers to the class members' substantive claims that are likely to resolve the litigation. *Id.* In *Wal-Mart*, the respondents sought to certify a class of female employees who alleged discrimination over pay and promotion in violation of Title VII of the Civil Rights Act of 1964. The Supreme Court noted that, in a Title VII suit involving an assertion of discriminatory bias, the principal substantive inquiry is the reason for an employment decision. *Id.* at 352. In the class action suit – where millions of discretionary employment decisions were at stake – the Supreme Court stated that, "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it [was] impossible to say that examination of all the class members' claims for relief . . . produce[d] a common answer to the crucial question *why was I disfavored*." *Id.* at 352 (emphasis in original).

Ultimately, the Supreme Court found that there was no commonality to respondents' merits contention that Wal-Mart engaged in a pattern or practice of discrimination, because, although the hiring and promotion decisions were based on a single Wal-Mart policy, the policy allowed discretion by local managers over employment matters, leading the Supreme Court to conclude that there was no "glue" holding the alleged reasons for all the hiring and promotion decisions together. *Id.* at 352, 355-60. The Supreme Court held that because the employment decisions were made by different Wal-Mart managers, across different stores, at different times, and for different reasons, there was "no convincing proof of a companywide discriminatory pay and promotion policy." *Id.* at 359-60.

Here, the petitioners argue that commonality is satisfied because all the class members have suffered the same injury – delay – "the denial of timely benefits due to the VA's broken appeals process."[10] Pet.'s Response at 12. The petitioners state that, although "the length of time they have waited for resolution of their pending appeals" is varied, this variance is unimportant "so long as the wait is more than [12] months." *Id.*

The petitioners identify two legal questions common to the proposed class members: (1) Whether extensive delays in failing to render decisions on disability claims within 12 months of timely NODs violate the proposed class members' due process rights; and (2) whether the proposed class members are entitled to a writ of mandamus compelling the Secretary to correct the severe delays and inaction under *Telecommunications Research & Action Center v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984).[11] Pet.'s Response at 13.

---

[10] In support of their Amended Petition, the petitioners point out that it takes a veteran an average of 6 years after the veteran files an NOD to receive a Board decision.

[11] The petitioners had argued that they had a third question in common: Whether VA's delay in adjudicating the proposed class members' claims amounts to an arbitrary refusal to act under *Costanza v. West*, 12 Vet.App. 133 (1999) (per curiam order). The petitioners had urged the Court to reject the *Costanza* standard and instead adopt the *TRAC* test for determining whether a writ of mandamus should issue. In *Martin v. O'Rourke*, 891 F.3d 1338, 1348

Though the petitioners argue that the reasons for delay are irrelevant to their two theories, the law makes clear that each of the petitioner's legal theories requires this Court to determine whether VA's delay is unreasonable. Whether delay is unreasonable can be determined by examining the substantive claims underlying their petition. For example, a claim based on a constitutional due process violation requires the Court to examine the justification VA offers for the delay. In *Federal Deposit Insurance Corp. v. Mallen*, 486 U.S. 230, 242-43 (1988), the Supreme Court examined a process permitting a postsuspension hearing followed by a 90-day delay in issuing a decision on a bank officer's suspension from office. In evaluating whether there had been a due process violation, the Supreme Court applied a balancing test involving the importance of the private interest and harm to that interest caused by delay; the justification offered by the Government for the delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.[12] *Id.*

Similarly, before this Court may conclude that VA's adjudication of the putative class members' appeals has been unreasonably delayed under *TRAC*, the Court must examine VA's explanation for the delay and weigh this explanation against other factors.[13] In *Martin*, *supra* note 11, the Federal Circuit stated that the first *TRAC* factor, referred to as the "rule of reason," requires the Court to "look at the particular agency action for which unreasonable delay is alleged," noting that "more complex and substantive agency actions" may be expected to take longer than "purely ministerial ones."[14] 891 F.3d at 1345-46. The Federal Circuit also noted that the Court may consider whether the delay is based on "complete inaction by . . . VA" or whether the delay may be attributed, in part, to "VA's statutory duty to assist a claimant in developing his or her case." *Id.*[15] Thus, the reasonableness or unreasonableness of VA's delay is a key element of each of the petitioner's claims.

---

(Fed. Cir. 2018), the Federal Circuit adopted the *TRAC* standard, in place of the *Costanza* standard, as the framework for this Court to use in evaluating mandamus petitions based on unreasonable delay. Because of the Federal Circuit's holding in *Martin*, there is no need to address class certification based on *Costanza*.

[12] The Supreme Court reformulated the balancing-factors test announced in *Mathews v. Eldridge*, 424 U.S. 319 (1976), for assessing the permissibility of postdeprivation process. *See Jordan by Jordan v. Jackson*, 15 F.3d 333, 345-46 (4th Cir. 1994) (applying *Mallen* factors in evaluating whether a delay in judicial review of a decision removing a child from his home, including the "likelihood that the state's removal of a child . . . will have been without cause, the strength of the state's justification for the delay, and the closeness of the relationship between this justification and the government's underlying interest").

[13] *TRAC*'s unreasonable-delay analysis requires weighing (1) the length of time that has elapsed since the agency came under a duty to act and its relation to a "rule of reason"; (2) whether Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed; (3) the character of the interests at stake – economic versus health and human welfare; (4) the effect of expediting delays on competing agency priorities; (5) the nature and extent of the interests prejudiced by delays; and (6) the presence of unreasonable delay, which does not have to be due to impropriety. *TRAC*, 750 F.2d at 79-80.

[14] Two specific ministerial tasks highlighted by the Federal Circuit are the RO's certifying of appeals to the Board and the Board's docketing of appeals. *Martin*, 891 F.3d at 1346.

[15] Examples of other courts applying the rule of reason analysis include *Irshad v. Johnson*, 754 F.3d 604, 607 (8th Cir. 2014) (reviewing reasons for agency delay as part of *TRAC* analysis and concluding that the agency delay was not unreasonable); *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987) (stating that under *TRAC* a court should "consider the agency's explanation, such as administrative necessity, insufficient resources, or the complexity of the task confronting the agency").

Judge Allen's dissent contends that our opinion is based on a flawed understanding of the theory underlying the petitioners' claims "that there is a period of time [more than 1 year between the filing of an NOD and the issuance of a Board decision] that is simply too long for a claimant to wait for a decision." *Post* at 26. This theory purportedly does not depend on the reason for the delay. Indeed, Judge Allen, echoing the petitioners, states that the reasons for the delay do not matter. *Id.* at 25-26. He claims that commonality exists because the petitioners pose two questions: "[H]ow long is too long under the Constitution's Due Process Clause?"[16] and is a 1-year delay between the filing of an NOD and the issuance of a Board decision unreasonable, entitling the proposed class members to a writ of mandamus compelling the Secretary to correct the severe delays and inaction? *Id.* Judge Allen contends that the Court is capable of answering both questions.

Regarding the constitutional claim, Judge Allen's dissent states that the petitioners' theory that some quantum period of delay is too long is supported by law and points to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 547 (1985). Mr. Loudermill, a security guard who had been terminated from employment, had to wait 9 months for an administrative decision following review of his termination. *Id.* at 535-36. He asserted that the administrative proceedings "took too long" and that the length of this delay constituted a due process violation. *Id.* at 546. The Supreme Court concluded that Mr. Loudermill had not stated a claim of constitutional deprivation because his claim "reveal[ed] nothing about the delay" and "[he] offer[ed] no indication that his wait was unreasonably prolonged other than the fact that it took nine months." *Id.* at 547. *Loudermill*, like *Mallen*, makes clear that delay cannot constitute a constitutional due process violation unless the delay is unreasonable. Thus, it is clear that the unreasonableness of VA's delay in adjudicating the petitioners' disability claims is a key substantive element of a due process claim based on delay.

Judge Allen's dissent also contends that, because of our purported flawed understanding of the true nature of the petitioners' claims, we mistakenly insist that "the petitioners must identify the causes for the delay to prevail." *Post* at 26. The fundamental flaw with Judge Allen's position is that it fails to recognize that, despite the petitioners' effort to argue that the reasons for VA's delay in adjudicating their compensation claims do not matter, the substantive law underscores that a central inquiry that must be resolved for each claim is whether VA's delay is unreasonable. Because reasonableness and unreasonableness are relative concepts, it is impossible to determine whether VA's delay in adjudicating disability compensation claims falls into either category

---

[16]Judge Allen's dissent erroneously contends that we have reframed the petitioners' questions. *Post* at 26. However, his opinion is the one that reframes the questions. The petitioners did not ask whether there was *some period of time* beyond which delay is unconstitutional and warrants the issuance of a writ of mandamus because of unreasonable delay. Rather, they asked two very specific questions: Whether a 1-year delay between the filing of the NOD and the issuance of a Board decision violates the Constitution's Due Process Clause and whether such delay entitles the petitioners to a writ of mandamus. Essentially, Judge Allen has replaced the very specific 1-year period selected by the petitioners with a broad, unspecified period. The effect of his reframing of the issues is that the Court would be left to fill in the blank and determine the exact time period that will or will not survive constitutional muster or entitle the petitioners to a writ of mandamus. Judge Allen's reframing of the issues also sends a signal to putative classes that the Court will gladly reframe issues for class certification purposes, a practice to be discouraged as it may encourage slapdash pleadings.

9

without exploring the reasons for the delay.[17] Our insistence that the petitioners identify the reasons for delay is so that we may determine whether commonality exists.

Contrary to Judge Allen's claim, the purpose of our examination of the varying reasons for delay at VA is not to resolve the merits of the claim. Rather, we conform with the duty under Rule 23(a), to look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996); *see Wal-Mart*, 564 U.S. at 351-52. This obligation to examine the nature of the substantive claim to see whether commonality exists among the class is part of the "rigorous analysis" that the certifying court must make. *Wal-Mart*, 564 U.S. at 351; *see Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1114 (9th Cir. 2014) ("To assess whether the putative class members share a common question, the answer to which 'will resolve an issue that is central to the validity of each one of the [class members's] claims,' we must identify the elements of the class members's case-in-chief." (quoting *Wal-Mart*, 564 U.S. at 350)).

The Secretary contends that there is no common answer to the question of the cause of VA's delay for each of the proposed class members. Secretary's Response to the Court's Oct. 2017 Order at 18-24. The Secretary points out that compliance with the statutory duty to assist is responsible for the delay experienced by some veterans.[18] *Id.* at 20-23. Additionally, he notes that VA's duty to provide veterans hearings on their claims may cause delay.[19] *Id.* And, in other cases, delay is precipitated by the number and complexity of the claims on appeal.[20] *Id.* Further, the Secretary argues that, because a delay of any particular period of time may be quite reasonable in one case and extremely unreasonable in another, certification of a broad class based on allegations of systemic delay throughout VA's two-step appellate process is inappropriate.[21] *Id.* The Federal

---

[17] Judge Allen's dissent maintains that *Wal-Mart* supports his analysis that reasons for the agency delay do not matter in this case. Judge Allen's dissent contrasts employment discrimination claims with the petitioners' due process claims. Judge Allen's dissent contends that, in employment discrimination claims, the "reasons for employment actions mattered in terms of their legality." *Post* at 25. By contrast, Judge Allen's dissent maintains that the legality of VA's actions do not depend on the reasons for VA's delay. However, Judge Allen's dissent fails to recognize that the reasons for VA's delay do matter in terms of the legality of the delay. The only delay that may give rise to the petitioners' constitutional or statutory claims is delay that is unreasonable. And, because not all delay within the VA claims system is unreasonable, the reasons for VA's delay do matter.

[18] Petitioners Briggs, Coyne, Hudson, Merrick, and Stokes continued to submit evidence throughout the appeal. Additionally, VA assisted these petitioners by obtaining records and scheduling VA medical examinations.

[19] Petitioners Coyne, Dolphin, Hudson, Merrick, and Stokes requested or participated in either DRO or Board hearings, and some petitioners participated in both.

[20] Petitioners Briggs, Coyne, Dolphin, Hudson, Merrick, and Stokes filed multiple claims, including as many as 19 claims.

[21] The Secretary notes that courts have been cautious in certifying cases involving allegations of due process violations. *See, e.g.*, *Crosby v. SSA*, 796 F.2d 576, 581 (1st Cir. 1986) (denying class claims alleging due process violations based on unreasonable delays; "delays may be analyzed for reasonableness only in the context of individual cases"); *Dale v. Hahn*, 440 F.2d 633, 640 (2d Cir. 1971) (finding that it may be "more appropriate to handle difficult constitutional questions arising from the application of a statute to varying fact-patterns on a case-by-case basis rather than in a class action"); *Lightfoot v. Dist. of Columbia*, 273 F.R.D. 314, 326, 326-28 (D.D.C. 2011) (stating that a "more amorphous due process claim [of systemic misconduct], which turns on the flexible, multi-factor balancing test mandated by *Mathews*, is not as easily susceptible to class[]wide treatment"); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018) (remanding case for lower court to consider whether a Rule 23(b)(2) class action continues

Circuit echoed a similar sentiment in *Martin*, when it stated that, given the nature of the reasonableness inquiry, "we see no reason to articulate a hard and fast rule with respect to the point in time at which a delay becomes unreasonable" under the *TRAC* standard. *Martin*, 891 F.3d at 1346.[22] The Federal Circuit reasoned that "[b]ecause . . . reasonableness depends on the particular agency action that is delayed, a two-year delay may be unreasonable in one case, and it may not be in another."[23] *Id.*

The Secretary's argument is persuasive. The petitioners have chosen not to seek to certify a class based on a specific practice or policy by the Secretary that results in unreasonable delays. Instead, the petitioners have posited that there is systemic delay throughout the appeals process, but they have not attempted to identify the causes for the delay, such that determining the "truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke."[24] *Wal-Mart*, 564 U.S. at 350. "Mere allegations of systemic violations of the law . . . will not automatically satisfy Rule 23(a)'s commonality requirement." *Devaughn*, 594 F.3d at 1195.[25]

---

to be the appropriate vehicle for due process claims, noting that due process calls for "'flexib[ility]'" (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972))).

[22] The Federal Circuit also agreed with our Court's decision below not to rely on the petitioners' proffer of VA's average statistical delay to answer the reasonableness inquiry, because the statistics are "merely speculative," and the Federal Circuit reiterated that VA's potential delay "depend[s] on a long 'chain of hypothesized actions'" in each petitioner's case. *Martin*, 891 F.3d at 1346 n.10 (quoting *Ebanks v. Shulkin*, 877 F.3d 1037, 1039 (Fed. Cir. 2017)).

[23] *Martin* also noted that a claim that an individual has been denied due process because of delayed agency action "'is essentially no different than an unreasonable delay claim.'" *Martin*, 891 F.3d at 1348 (quoting *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 660 (D.C. Cir. 2010)).

[24] The petitioners' lack of regard for whether the complained of delay is unreasonable may be illustrated by the decision to include Ms. Obie as a named petitioner. The petitioners do not dispute the Secretary's assertion that the lengthy delay Ms. Obie experienced is a result of her failure to submit a particular form to VA.

[25] Courts have made similar decisions. *See, e.g.*, *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 843-44 (5th Cir. 2012) (denying class certification where the proposed common issues "'stretch[] the notions of commonality' by attempting to aggregate several amorphous claims of systemic or widespread conduct into one 'super-claim'" (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997))); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 494, 497 (7th Cir. 2012) (dismissing a class that "sought to lump together thousands of disparate plaintiffs with widely varying individual claims"); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999) (finding that, instead of advancing a discrete question of law, the proposed class broadly "conflate[d] a variety of claims to establish commonality via an allegation of 'systemic failures'"); *Stewart v. Winter*, 669 F.2d 328, 337 (5th Cir. 1982) (denying class certification where there was only an abstract common question meaning that "any allegation of a breach of legal duty by any class of defendants – no matter how vast or diverse – could be impressed into a single case").

11

On the other hand, courts have found commonality when the substantive challenge of a proposed class was confined to a specific policy or course of conduct that affects all members of the putative class in the same way. *See, e.g.*, *DL v. District of Columbia*, 860 F.3d 713, 724 (D.C. Cir. 2017) (certifying four subclasses defined in reference to particular uniform policies or practices); *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 436, 440 (7th Cir. 2015) (upholding class certification in a racial discrimination suit where three African-American teachers lost their positions as part of a "turnaround" policy of deficiently performing schools); *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 797 (8th Cir. 2014) (affirming certification of wage-and-hour class action where class challenged a specific company payment policy that applied to all class members).

In *Parsons v. Ryan*, 754 F.3d 657, 662 (9th Cir. 2014), the U.S. Court of Appeals for the Ninth Circuit (Ninth Circuit) approved the district court's certification of a class and subclass. The class consisted of inmates seeking redress from deficiencies in the prison health care system that had allegedly exposed all inmates to a substantial risk of serious harm. The subclass consisted of inmates who claimed that the conditions of isolation units constituted cruel and unusual punishment. *Id.* In making the claims about systemic deficiencies, the class members identified 10 specific uniform statewide policies and practices governing the health care system and 7 specific policies governing the prison isolation units. *Id.* at 678. The Ninth Circuit found that the district court had not abused its discretion in certifying the class and subclass because the class members pointed to specific policies and practices that were "defined with sufficient precision and specificity; they involve particular and readily identifiable conduct on the part of the defendants." *Id.* at 683. In discussing the policies of the health care system, the Ninth Circuit stated:

> Each of these 10 policies and practices affords a distinct basis for concluding that members of the putative class satisfy commonality, as all members of the class are subject identically to those same policies and practices, and the constitutionality of any given policy and practice with respect to creating a *systemic*, substantial risk of harm to which the defendants are deliberately indifferent can be answered in a single stroke.

*Id.* at 679 (emphasis added). The lesson to be learned from *Parsons* is that a class proceeding may be an appropriate vehicle to challenge systemic deficiencies, but only when the putative class targets specific polices or practices that allegedly violate the law. However, at oral argument, the petitioners clarified that they do not challenge specific VA policies or practices. *See* Oral Argument ("Oral Argument") at 31:15-44, *Monk v. Wilkie*, U.S. Vet. App. No. 15-1280 (oral argument held Mar. 5, 2018), http://www.uscourts.cavc.gov/oral_arguments_audio.php (petitioners' counsel clarifying: "[T]here is no express system-wide policy or procedure [that we are challenging].").

Here, we conclude that there is no common question for the petitioners' and putative class's cause of delay, the answer to which "will resolve an issue that is central to the validity of each one of the [class member's] claims." *Wal-Mart*, 564 U.S. at 350. Therefore, we conclude that, because the petitioners have not satisfied the commonality requirement, the Court need not address the remaining Rule 23(a) prerequisites.

E. Rule 23(b)(2)

The petitioners seek relief in the form of an order from the Court directing the Secretary to issue a Board decision in all the putative class members' claims within 1 year following the timely filing of an NOD. Yet, apparently recognizing that some of the delay in adjudicating VA claims is reasonable and is related to VA's development of evidence to support a veteran's claim, the petitioners propose that the 12-month deadline could be waived by a veteran to allow the claim to be developed.[26] *See* Oral Argument at 15:30-16:05, 45:40-46:00, 59:33-1:00:14, 2:24:30-2:26:09.

Rule 23(b)(2) of the Federal Rules of Civil Procedure permits a court to certify a case for class-action treatment if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Rule 23(b)(2), on the other hand, "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Wal-Mart*, 564 U.S. at 360. In *Wal-Mart*, the Supreme Court stated that "the key to the (b)(2) class is 'the indivisible nature of the [relief].'" *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). The idea underlying Rule 23(b)(2) is that the relief applies to all the class members, or to none of them. *Id.* Here, the relief proposed by the petitioners does not satisfy Rule 23(b)(2) because it would require that the remedy be individualized and tailored to the needs of the individual veteran. This kind of relief would not truly be classwide. The relief the petitioners seek does not satisfy Rule 23(b)(2)'s standard as there is no single injunction that provides relief to the class as a whole.

Upon consideration of the foregoing, it is

ORDERED that the petitioners' motion for class certification is DENIED.

DATED: August 23, 2018

DAVIS, *Chief Judge*, concurring: I fully join Judge Schoelen's opinion. I write separately to make the point that time spent by VA processing cases is not always unreasonable or unconstitutional delay. I also believe that 5 to 7 years generally for claims processing at VA is unreasonable, that is, takes entirely too long. With a backlog of more than 450,000 cases, the claims processing system needs to be radically changed to provide more efficient claims resolution, perhaps a reasonable goal would be to resolve, claims within 3 years. A good system would include the following features, among others: Finality, a closed record, aggregate claims resolution, alternative dispute resolution, and claims waivers for immediate cash payments. Without radical change or a new system implementing the features mentioned, backlog and delay will continue to be the norm.

The petitioners in this case have asserted that a 1-year delay from the filing of an NOD to a Board decision is unconstitutional or, at a minimum, statutorily unreasonable. In her opinion, Judge Schoelen correctly recognizes that answering this question requires the Court to consider

---

[26] Because the development of a claim may include hearings before the RO and the Board, it would appear this waiver may also have to be extended to the right to have a hearing.

the cause of the delay and that the petitioners have not demonstrated a common question or common answer as required by *Wal-Mart Stores, Inc. v. Dukes*, 546 U.S. 338 (2011).

In his dissent-in-part, Judge Allen, joined by Judges Bartley and Toth, frames the class issue as whether the "delays in the VA benefits system are both unconstitutional and 'unreasonable' no matter the reason."[27] He believes that this issue presents common questions, such as "how long is too long under the Constitution's Due Process Clause? [28] or "whether a 1-year delay between the filing of an NOD and the rendering of a decision is 'unreasonable,' regardless of the constitutional boundary,"[29]as "they are the same for every person who is a member of the class."[30] I do not agree.

*Wal-Mart* instructs that "[c]ommonality requires the plaintiff to demonstrate that the class members 'have all suffered the same injury,' . . . [not] merely that they have all suffered a violation of the same provision of law."[31] The proposed class questions in Judge Allen's dissent-in-part focus only on the latter part of the inquiry—whether the petitioners' constitutional or statutory rights have been violated—without regard to whether their injuries are, in fact, common, or whether addressing their injuries is "of such a nature that it is capable of classwide resolution."[32]

These are critical questions because, "[w]ithout some glue holding the alleged *reasons* for all the alleged [delays] together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was [my claim delayed]*?"[33] Thus, *Wal-Mart* requires that a class must have claims that "depend on a common contention" that is "capable of classwide resolution" such that a "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[34] Here, there are countless different reasons for processing time for each claim; therefore, one answer will not resolve all claims. Significantly, claims processing time does not necessarily mean "delay."

As Judge Schoelen notes, "[t]he petitioners have chosen not to seek to clarify a class based on a specific practice or policy by the Secretary . . . . [and] they have not attempted to identify the causes for the delay."[35] But the four Judges finding no commonality do not, contrary to the position taken by my colleagues in Judge Allen's dissent-in-part, reject the petitioners' legal theory or improperly reach the merits of their claims. Instead, Judge Schoelen's opinion recognizes that the VA appeals process is not a monolith and that *any* answer to the petitioners' questions requires a

---

[27] *Post* at 23.

[28] *Post* at 24.

[29] *Post* at 24.

[30] *Post* at 25.

[31] 546 U.S. at 350.

[32] *Id.*

[33] *Id.* at 352.

[34] *Id.* at 350.

[35] *Ante* at 11.

fact-specific inquiry driven by multifactor balancing tests.[36] Indeed, as the Federal Circuit recently recognized, whether a delay is unreasonable in any given case hinges, in part, on a "'rule of reason' analysis [that] must, of course, look at the particular agency action for which unreasonable delay is alleged" and "whether the delays complained of are based on complete inaction by the VA, or whether the delays are due in part to the VA's statutory duty to assist a claimant in developing his or her case."[37]

The VA adjudication process is complex, consisting of many stages that impose many obligations on both VA and the claimant. Some stages—particularly those involving only administrative or ministerial tasks—may indeed produce unlawful delays.[38] On the other hand, some stages will inherently take time to complete. For example, a veteran might submit evidence that triggers VA's duty to provide a medical examination, or a case might require VA to submit inquiries to the National Archives and the Department of Defense. The amount of time it takes to properly develop an appeal will necessarily vary case by case and veteran by veteran, and it is wrong to equate the mere passage of time with delay without some inquiry into *why* time has passed.

Ultimately, whether 1 year, 5 years, or even 10 years elapsing between an NOD and a Board decision is unlawful depends entirely on what caused that much time to pass. To rule on the constitutionality or reasonableness of a delay,[39] the Court must apply balancing tests based on many factors, including the reasons for that delay. Based on the extremely broad assertions presented by the petitioners in this case, Judge Schoelen's opinion correctly finds no commonality.

This is not to say that, in a case where petitioners show that the weights on the balancing-test scales are the same for each class member, the Court would not certify a class to challenge *part* of VA's appellate process. There may very well be portions of that process that are ripe for aggregate remedies, and I am confident that the Court would certify a class when presented with the appropriate facts.

Finally, I want to emphasize the significance of the Court's decision and the historic nature of this case. Although Judge Allen calls Judge Schoelen's opinion a "plurality," that label is only partly accurate. As I read the various separate statements filed in this decision, six other judges join that part of Judge Schoelen's opinion prior to section II.D, addressing commonality. Those sections agreed upon by seven of the Court's Judges may well constitute a majority opinion, and I see no reason why those sections are not entitled to recognition as binding precedent. Only the commonality and remedy sections lack precedential value.

---

[36] *See ante* at 8 (describing the balancing tests required by our precedent).

[37] *Martin v. O'Rourke*, 891 F.3d 1338, 1345, (Fed. Cir. 2018).

[38] *See id.* ("For example, [the Court] should consider whether delays are due to the agency's failure to perform certain ministerial tasks such as filling out the form certifying the appeal to the [Board] and docketing by the [Board].")

[39] *But see id.* at 1348 ("If the Veterans Court, employing the [] analysis [set forth in *Telecommunications Research & Action Center v. FCC ("TRAC")*, 750 F.2d 70, 76 (D.C. Cir. 1984)], finds a delay unreasonable (or not unreasonable), it need not separately analyze the due process claim based on that same delay." (citing *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 660 (D.C. Cir. 2010))).

In the precedential parts of its decision, the Court holds that it will, in appropriate cases, entertain class actions. This holding is a seismic shift in our precedent, departing from nearly 30 years of this Court's case law. The fact that the Court did not find aggregate action appropriate in this case does not change the fact that this is a watershed decision, and its importance should not be diminished merely because the Court declined to certify this proposed class. On the contrary, the Court's decision will shape our jurisprudence for years to come and, I hope, bring about positive change for our Nation's veterans and ensure that justice is done more efficiently and timely.

ALLEN, *Judge*, with whom BARTLEY and TOTH, *Judges*, join, concurring in part and dissenting in part.

To state the obvious, this is an incredibly important case. I concur fully in the plurality opinion's[40] determinations that the Court will, in appropriate cases initiated by a petition, utilize class action or aggregate resolution procedures and that it will consider Federal Rule of Civil Procedure 23 as a guide for doing so. *See ante* at 6. These are important decisions for this Court and its congressionally mandated role to provide meaningful judicial review to veterans[41] and other claimants in the VA system.[42]

I part ways with the plurality, however, with respect to its determination that the proposed class does not satisfy the prerequisites for certification. Specifically, the plurality concludes that the proposed class does not qualify for class treatment principally because it does not satisfy the requirement under Federal Rule of Civil Procedure 23(a)(2) that "there are questions of law or fact common to the class." *See ante* at 6,12. I believe the plurality fundamentally misapprehends and misapplies this commonality requirement by imposing too high a bar for certification and conflating resolution of the merits of the petitioners' claims with the procedural question of commonality.

---

[40] I refer to Judge Schoelen's opinion as the "plurality" because it is the opinion in which the most Judges concur. It might have been more accurate to describe the opinion as a concurrence, but for what it's worth, I've used "plurality."

[41] In the remainder of this opinion, I generally use the term "veteran" to describe those individuals participating in the VA administrative appeals process. I mean "veteran" to encompass all claimants for benefits, including non-veteran claimants, unless context dictates otherwise.

[42] I also thank counsel for the parties and amici for the universally excellent briefing in this matter. I would never have thought that nearly 500 pages of legal argument would serve to *simplify* matters, but it did. That was due in large measure to the serious attention devoted to putting these materials together.

As I explain below, the plurality does not accept the claims the petitioners make in this matter. The petitioners claim that the current system for resolving VA administrative appeals leads to delays that are simply too long under both the Constitution and the statutes regulating the Agency. The petitioners also claim that this delay is unlawful because resolving the appeal takes longer than 1 year. These may not be "good" claims, but they are the petitioners' claims. And it is those claims the Court should use to make the certification decision at hand. By refusing to accept the petitioners' claims, the plurality stacks the deck against certification. This is unfortunate. In so doing, the plurality has effectively precluded the Court from playing a meaningful role in addressing the systemic deficiencies plaguing the veterans benefits system—at least for today. Accordingly, I respectfully dissent.

In the detailed opinion that follows, I begin by considering the factual and procedural context of the petitioners' claims for class action treatment. This discussion is important not only to lay the foundation for the legal arguments, but also to make clear just how serious the claims the Court faces are. Thereafter, I comment briefly on the portions of the plurality opinion in which I concur. Finally, I turn to a detailed explanation of why the proposed class satisfies the requirements for class treatment including commonality.[43]

## I. THE FACTUAL AND PROCEDURAL CONTEXT

In his novel *Bleak House*, Charles Dickens writes of a fictional case in the English High Court of Chancery, *Jarndyce v. Jarndyce*. That suit had been pending for so long that "[i]nnumerable children have been born into the cause; innumerable young people have married into it; innumerable old people have died out of it . . . [and] a long procession of Chancellors has come in and gone out." 1 WORKS OF CHARLES DICKENS 4-5 (1891). For Dickens, *Jarndyce v. Jarndyce* was a useful literary device to tell his story. Sadly, however, it is also an apt analogy for what countless veterans face when seeking benefits from the Department of Veterans Affairs.[44]

The petitioners are all veterans who served our Nation and sought benefits from VA. And each has waited years to have their benefits claim decided after they disputed an initial decision by filing an NOD. The details of their stories vary (as one would expect), but the ultimate outcome is the same: significant delays.[45]

Unfortunately, the petitioners are not outliers. VA's veterans benefits system is beset by delays certainly rivaling those in the fictional *Jarndyce v. Jarndyce*, some of which are quite difficult to comprehend. As of May 2017

---

[43] As I explain, I would certify the class. That is all the Court is called on to decide today. I do not address either merits or remedial issues in this opinion, beyond what is necessary to address the certification question.

[44] The Supreme Court has also used *Bleak House* to invoke the notion of legal proceedings that seemingly have no end. *See, e.g., Stern v. Marshall*, 564 U.S. 462, 468 (2011); *Hartman v. Moore*, 547 U.S. 520, 526 (2006).

[45] We should never forget the human faces associated with the abstract concept of administrative delay. Such delays for veterans seeking benefits can have profoundly significant real-world implications. *See Amicus Curiae* Brief of Swords to Plowshares, Connecticut Veterans Legal Center, New York Legal Assistance Group, Veteran Advocacy Project, and Legal Aid Service of Broward County in Support of Petitioners at 7-19 (Feb. 8, 2018), *Monk v. Shulkin*, U.S. Vet. App. No. 15-1280 (argued Mar. 5, 2018), http://efiling.uscourts.cavc.gov (describing consequences such as homelessness, health problems, and threats to physical safety flowing from delays in VA benefits adjudications).

- After filing an NOD, a veteran waits on average 16.5 months to receive a Statement of the Case (SOC);

- a veteran who elects to proceed with a formal appeal to the Board after receiving an SOC waits on average 33 months for VA to certify and transfer the appeal to the Board, an action that is largely ministerial; and

- a veteran then waits yet another 9.5 months for the Board to issue a decision. [46]

Combined, these figures mean that after a veteran initiates an administrative appeal by filing an NOD, the veteran waits nearly 5 years for a Board decision. This is staggering. Moreover, unlike in Dickens' fictional tale, we do not have just a single case. Instead, there are more than 450,000 claims in appellate status before VA. *See* Board of Veterans' Appeals, *Annual Report* FISCAL YEAR 2016, at 30 (2017).

The petitioners sought to exit the "hamster-wheel" on which they found themselves. *See Coburn v. Nicholson*, 19 Vet.App. 427, 434 (2006) (Lance, J., dissenting) (discussing "the hamster-wheel reputation of veterans law"). They filed petitions under the All Writs Act, 28 U.S.C. § 1651(a), seeking an order "directing [the Secretary] to render decisions on pending appeals within one year of receipt of timely NODs and to render decisions on [the named petitioners'] pending appeals within sixty days."[47] Amended Pet. at 19. The petitioners claim that the current VA system is so poorly designed and managed that the time it takes to render decisions is unlawful under both statutory and constitutional principles. *See* Amended Pet. at ¶¶ 30-48.

The petitioners essentially argue that the delays in the VA benefits system violate the law in two independent ways, regardless of the reasons for the delay. That is, the petitioners posit that there is a time that is simply "too long" to wait for a result, no matter what makes the process that lengthy. First, the petitioners note that, as claimants seeking benefits, they have a constitutionally protected property interest in their benefits claims. *Id*. at ¶ 31 (citing *Cushman v. Shinseki*, 576 F.3d 1290, 1298 (Fed. Cir. 2009)). Given this constitutionally privileged status, the petitioners continue, the flexible balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), indicates that the average delays in the VA system are unconstitutional. Amended Pet. at ¶¶ 32-35. Alternatively,

---

[46] The statistics I provide above are taken from the Board's May 5, 2017, response to the petitioners' request under the Freedom of Information Act (FOIA). This document is attached as Exhibit A to the Corrected Amended Petition for Extraordinary Equitable and Collective Relief (Amended Pet.). The statistics are consistent with statistics contained in a recent VA Office of Inspector General report that the petitioners submitted as supplemental authority. *See* VA OIG REPORT No. 16-01750-79, VETERANS BENEFITS ADMINISTRATION, REVIEW OF TIMELINESS OF APPEALS PROCESS, (Mar. 28, 2018)

[47] Counsel for the petitioners made clear at oral argument that the "decisions" referred to in the amended petition were those of the Board. Oral Argument at 10:32-11:22. The petitioners were far too coy in the amended petition about what "decisions" they sought. The lack of clarity on that point does not have legal significance because we know now what the term means as used in the petition. Nevertheless, the failure to be upfront about this issue affected both counsel for the Secretary and the Court. Given the otherwise high quality of the petitioners' papers and argument in this case, I remain quite baffled about the decision to "hide the ball" on such an important issue.

18

the petitioners assert that these delays are "unreasonable" to the degree that the Court has the statutory authority to correct them. *Id.* at ¶¶ 36-48; *see* 38 U.S.C. § 7261(a)(2) (providing that the Court has the power to "compel actions of the Secretary unlawfully withheld or unreasonably delayed").

The class proposed to address the claimed legal deficiencies in the VA system was defined (as seen through the lens of the oral argument clarification concerning the meaning of "decision," *see supra* note 46) as individuals who

(1)  "applied for and [had] been denied VA disability benefits in whole or in part;"
(2)  "timely filed an NOD upon denial of an original, reopened, or remanded claim;" and
(3)  did not receive a Board "decision on the pending appeal within twelve (12) months of the date of the NOD."

Amended Pet. at ¶ 13.

Of course, each petitioner has his or her own story leading to a purported unreasonable delay.[48] Each may seek relief independently, so why proceed as a class? The Federal Circuit effectively answered that question in *Ebanks v. Shulkin*, 877 F.3d 1037 (Fed. Cir. 2017). That appeal concerned the denial of a writ of mandamus based on delay in holding a Board hearing. *Id.* at 1038. The Federal Circuit commented that it was uncomfortable with granting a writ in an individual case for "veterans who claim unreasonable delay in VA's first-come-first-served queue." *Id.* at 1039-40. This was so because granting individual relief "may result in no more than line-jumping without resolving the underlying problem of overall delay." *Id.* at 1040; *see Monk v. Shulkin*, 855 F.3d 1312, 1321 (Fed. Cir. 2017) (commenting that "a claim aggregation procedure may help the Veterans Court achieve the goal of reviewing the VA's delay in adjudicating appeals"); *see also Young v. Shinseki*, 25 Vet.App. 201, 215 (2012) (en banc) (Lance, J., dissenting) (noting the Secretary's tendency to correct problems of veterans raised in a petition such that that individual dispute becomes moot). So, what was to be done? The Federal Circuit stated that "the issue [of systemic delay] seems best addressed in the class-action context, where the court could consider class-wide relief." *Ebanks,* 877 F.3d at 1040.

As I explain below, the plurality's interpretation of class certification prerequisites renders the Federal Circuit's comments in *Ebanks* largely meaningless. The plurality's reading of the commonality requirement makes it functionally impossible to certify a class in many delay claims. That position is entirely at odds with the Federal Circuit's comments in both *Ebanks* and *Monk.* Before exploring this topic of disagreement, however, I take a brief detour to discuss the portions of the plurality opinion with which I strongly agree.

---

[48] One should not take this comment out of context. The reality that each petitioner has his or her story does not mean that the proposed class lacks commonality. I explain why that is so in detail below.

19

## II. IMPORTANT AREAS OF AGREEMENT WITH THE PLURALITY

While, as I explain below, I strongly disagree with the plurality's conclusion that the proposed class does not satisfy the commonality requirement, I want to be entirely clear about my agreement with the plurality on several important matters.

*First*, the Court's decision to unequivocally embrace its power to use the class action device in connection with petitions seeking extraordinary writs is groundbreaking.[49] I agree entirely with this holding. In appropriate cases, aggregate resolution of issues will allow the Court to address systemic problems in the VA system and more fully protect the rights of the men and women who served our Nation. The import of this portion of the plurality's opinion cannot be overstated.

I would expressly do one thing in this regard that the plurality does not. I would unequivocally overrule *Harrison v. Derwinski*, 1 Vet.App. 438 (1991) (en banc). Nearly three decades ago in *Harrison*, this Court held that it would not utilize class actions. *Id*. at 438-39. It did so for three reasons: (1) The Court did not have the authority to do so; (2) class actions would be unmanageable in an appellate court setting; and (3) class actions were unnecessary because the Court has the power to issue precedential decisions. *Id*. To the extent that *Harrison* was ever correct, its time in the sun has passed.

The Federal Circuit has clearly held that *Harrison*'s first reason (lack of authority) is incorrect. *Monk*, 855 F.3d at 1322 ("We hold that the Veterans Court has the authority to establish a class action mechanism or other method of aggregating claims."). I also believe that the Federal Circuit rejected (at the very least implicitly) the other two reasons, manageability and the availability of precedential decisions, as categorical bases for not adopting a class action device. *See, e.g., id*. at 1320 (discussing *Harrison*). But even if it has not rejected those reasons, those reasons cannot retain any viability given the Court's holding today that it *will* entertain class actions in certain appropriate matters. *Harrison* cited manageability and precedential opinions as part of its *categorical* rejection of class actions also. 1 Vet. App. at 438-39. Given the Court's decision today that there is no such categorical bar—at least with respect to petitions—*Harrison* cannot remain the law. We should remove any doubt on that score and expressly overrule it.

This is not to say that manageability and the use of precedential opinions have no relevance to whether a class action is appropriate in a specific matter; of course they do. They just no longer serve as a complete bar to using the class action procedure.[50] I return to these matters below. *See infra* part III(d).

---

[49] As does the plurality, I leave for another day whether the class action device is an appropriate procedural vehicle in the context of an appeal. *See ante* at 2 n.4.

[50] My point about clearly overruling *Harrison* is not a mere technicality. *Harrison* was an en banc decision of the Court. As such, it is binding on all panels. *See Bethea v. Derwinski*, 2 Vet.App. 252, 254 (1992). If the second and third *Harrison* categories remain viable in the way *Harrison* described them, future panels must categorically reject class actions. As I explained, I do not think that is a tenable position given both the Federal Circuit's decision in *Monk* and our decision today. If that is correct, there simply is no reason to leave the procedural question of *Harrison*'s continued viability ambiguous.

*Second*, the Court wisely adopts Rule 23 as a guide (at least for now) in terms of using the class action device. Rule 23 has a long history in the Federal courts and our fellow Federal judges (as well as lawyers and law professors) have generated many resources for the Court to use as it embarks on this endeavor. The Court quite rightly recognizes that there is no need for it to go on this journey alone.

I pause to underscore one important point about using Rule 23 as a guide. That rule was adopted for, and has been used by, Federal district courts. Clearly, certain portions of the rule simply will not apply here, for example monetary-based classes under Rule 23(b)(3). There is no reason to conclude that the Court's use of Rule 23 as a guide means that all interpretations of that rule in the trial court setting necessarily apply here. Our Court is unique in many ways, one of them now being that it will be an appellate body using the class action device. Given this uniqueness, the Court should independently assess on a case-by-case basis whether a given interpretation of a provision of Rule 23 makes sense at this Court.[51] After all, a guide is merely that.

To repeat, these matters with which I agree are truly significant. The disagreement I have with the plurality—to which I turn now—should not obscure that point.

### III. THE PROPOSED CLASS SATISFIES THE REQUIREMENTS FOR CERTIFICATION.

The proposed class in this case satisfies all the prerequisites for certification under the guidance of Rule 23(a) and fits comfortably into the functional category Rule 23(b)(2) defines. The plurality concludes that the class should not be certified because it does not satisfy the commonality requirement of Rule 23(a)(2). *See ante* at 12. I first explain why that determination is incorrect. After that, I proceed to address the remaining factors under Rule 23(a) as well as the requirements of Rule 23(b)(2). Finally, I briefly consider why manageability concerns and the availability of precedential decisions do not counsel against class action treatment.

#### A. The proposed class satisfies the commonality requirement.

The plurality's conclusion that the proposed class fails to satisfy the commonality requirement of Federal Rule of Civil Procedure 23(a)(2) is incorrect.[52] The plurality reasons that

---

[51] To the extent that portions of Rule 23 have constitutional underpinnings, the Court would be bound to apply those principles.

[52] As I noted above, there is no reason that the Court need adopt all non-constitutionally based interpretations of Rule 23 when using its provisions as a guide. In an appropriate case, I would be open to considering whether the commonality requirements the plurality derives from *Wal-Mart v. Dukes*, 564 U.S. 338 (2011), *see ante* at 7, should apply in matters before this Court. Other courts have done the same in circumstances in which Rule 23 did not technically apply but provided potential guidance. *See, e.g.*, *Essame v. SSC Laurel Operating Co. LLC*, 847 F. Supp. 2d 821 (D. Md. 2012) (declining to apply *Wal-Mart* and noting that "Rule 23 standards are generally inapplicable to [Fair Labor Standards Act] collective actions."). Because, as I explain below, this proposed class satisfies *Wal-Mart*'s heightened commonality standard, I leave that matter for another day. I do note here that the Supreme Court's conclusion about commonality in *Wal-Mart* has been the subject of sustained criticism. *See, e.g.*, Robert H. Klonoff, *The Decline of Class Actions*, 90 WASH. U. L. REV. 729, 776 (2013) (noting that "[t]he majority

commonality is lacking because "[t]here is no common question for the petitioners' and putative class's cause of delay." *Ante* at 12.

Although the plurality accurately recites the Supreme Court's most recent comprehensive description of the commonality requirement in Rule 23(a)(2), *see ante* at 7 (discussing *Wal-Mart*), it has misconstrued that decision and erected too high a bar for finding commonality. Most critically for today's decision, the Supreme Court noted that it was not the common questions that truly mattered for class certification purposes, but rather whether there were common answers to such questions sufficient to "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. In other words, if there is no common thread connecting the class members' claims such that pulling that thread will affect each class member, the class is insufficiently cohesive to warrant class treatment. *See id*. at 352 ("Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." (emphasis in original)). The Supreme Court made clear that there need be only one common question, the answer to which drives the litigation in order to satisfy Rule 23(a)(2). *Id.*, 564 U.S. at 359. The plurality does not give sufficient weight to this part of the Supreme Court's discussion in *Wal-Mart*.[53]

The task, then, is to consider whether the petitioners' claims have in common the answer to at least a single question that would drive the litigation as to each member of the proposed class. How does one go about this task? This is where things get a bit slippery.

The "slipperiness" concerns how much a court should consider the merits of a claim at the class certification stage. As I will explain, the answer is "enough, but not too much." To start, there is no question that a court must consider the merits in some measure as part of the class certification inquiry. *See ante* at 6 (discussing overlap between certification and merits). As the Supreme Court noted in *Wal-Mart*, "[f]requently [the] rigorous analysis [required for class certification] will entail

---

decision in *Dukes* cannot be squared with the text, structure, or history of Rule 23(a)(2)"); Joseph A. Seiner, *Weathering* Wal-Mart, 89 NOTRE DAME L. REV. 1343, 1365-68 (2014) ("[T]he [*Wal-Mart*] decision omits [] any discussion of the vast majority of class action cases that look nothing like *Wal-Mart* at all. . . . This is likely because the decision was really only intended to apply to the Wal-Mart situation itself."); A. Benjamin Spencer, *Class Actions, Heightened Commonality, and Declining Access to Justice*, 93 B.U. L. REV. 441, 444-45 (2013) ("Rule 23(a)'s commonality language says nothing of the nature or import of the legal or factual questions that class members' claim must share, nor does it mandate that class plaintiffs be bound together by the 'same injury'").

[53] As I explain above, the plurality does not accept the petitioners' legal theory, leading the plurality to focus on the various reasons why a claim may be delayed. *See ante* at 8. In recasting the petitioners' actual claim in this way, the plurality has obscured the common questions the class members share, questions that would advance the resolution of the claim of each and every class member. In doing so, the plurality also engrafts onto Rule 23(a)(2) a requirement found only in Rule 23(b)(3), namely that common issues predominate over individual ones. FED. R. CIV. P. 23(b)(3) (providing that to certify a class under that provision of the rule a court must find "that the question of law or fact common to the class members predominate over any questions affecting only individual members"). Justice Ginsburg made the same argument in her *Wal-Mart* dissent. 564 U.S. at 375-77 (Ginsburg, J., dissenting). Justice Scalia rebuffed the charge because, he said, the Supreme Court majority highlighted the dissimilarities in plaintiffs' claims because there was nothing left that could serve as the glue to hold the class claims together. *Id.* at 359 ("We consider dissimilarities not in order to determine (as Rule 23(b)(3) requires) whether common questions *predominate*, but in order to determine (as Rule 23(a)(2) requires) whether there is even a single common question. And there is not here." (internal punctuation removed; emphasis in original)).

some overlap with the merits of the plaintiff's underlying claim." 564 U.S. at 351 (internal quotation marks omitted). This makes perfect sense. As the Supreme Court explained in an earlier decision, "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Gen. Tele. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

At the same time, however, it is not appropriate for a court to base its class certification decision on the ultimate merits of the underlying claims. *See, e.g., Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) ("[T]he court should not turn the class certification proceeding into a dress rehearsal for the trial on the merits."). This too makes sense. It would be strange indeed if a court could say "the plaintiff wins on the merits, therefore the class is certified" or vice versa. The merits must be considered not in the same way they would be to resolve the case—that is, to determine whether one side prevails or not. As the Supreme Court made clear *after Wal-Mart*: "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen,* 568 U.S. at 466 (citing *Wal-Mart*, 564 U.S. at 352 n.6).

An analogy may help illustrate how the commonality inquiry works as well as highlight the error in the plurality's reasoning. Assume that each class member's claim is a small boat floating on the water in a pool. The commonality inquiry (for this metaphorical pool) is trained on whether there is a single action that will cause the pool to drain or fill such that all the boats will move together. If there is, there is commonality among the boats because there is a single action that affects them all "in one stroke." *See Wal-Mart*, 564 U.S. at 350. This inquiry is entirely agnostic as to whether the boats rise or fall. *See Amgen*, 568 U.S. at 459 (stating, in the analogous setting of determining whether common questions predominate over individual ones, that one asks only if there are common questions "not that those questions will be answered, on the merits, in favor of the class."). The key is that the single action makes them *all* move.

The analysis is the same if we substitute the far more serious claims these putative class members possess for our fictional boats. Each of the class members' claims depends on the contention that the veteran simply has waited too long for resolution of his or her claim for benefits, no matter what the reason. In other words, there is systemic failure. We must then determine whether there is anything we can ask such that an answer will "in one stroke" affect each claim (i.e., can we make the water move in such a way that each claim rises or falls). *See Wal-Mart*, 564 U.S. at 350. There most certainly is a question we can ask. In fact, there is more than one question (although, as mentioned above, one is all that is necessary).

To understand why this is so, we need to recall the gravamen of the petitioners' claims. They assert that the delays in the VA benefits system are both unconstitutional and "unreasonable" no matter the reason. Amended Pet. at ¶¶ 30-48. The marker petitioners set for when delay becomes unconstitutional and/or unreasonable is 1 year from the filing of an NOD and the issuance of a Board decision. *Id.* at 19 (taking into account the petitioners' oral argument clarification). On these allegations, common questions under *Wal-Mart* abound.[54]

---

[54] I focus on the petitioners' constitutional claims. It is easy to read *Martin* as requiring the assessment of the

First, the Court could answer the question: How long is too long under the Constitution's Due Process Clause? The petitioners may not be correct as a matter of law that 1 year between an NOD and a Board decision is constitutionally problematic. Or they may be correct that the Constitution does not abide that delay. Or the Court could approach the matter in a way akin to courts that have considered whether a given system was structured in such a way that it exposes participants to too great a risk of constitutional harm.[55] Here, it might be that the petitioners cannot convince the Court that the VA system contains too great a risk of constitutional harm. Or maybe they will convince us that it does.

Second, the Court could decide whether a 1-year delay between the filing an NOD and the rendering of a Board decision is "unreasonable," regardless of the constitutional boundary.[56] In other words, the Court could avoid the constitutional question entirely. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

As both the plurality, *see ante* at 8, and Chief Judge Davis, *see ante* at 15, n.36 (Davis, C.J., concurring), note, the Federal Circuit recently issued a decision that has implications for the petitioners' statutory claim. *Martin v. O'Rourke*, 891 F.3d 1338 (Fed. Cir. 2018).[57] The *Martin* court concluded that this Court has been employing an incorrect standard for assessing whether claimed delay by the Secretary is unreasonable. *Id.* at 1348. In particular, the Federal Circuit instructed that this Court should address claims of unreasonable VA delay using a six-part standard first articulated by the D.C. Circuit in *Telecomm. Research & Action Center. v. FCC ("TRAC")*, 750 F.2d 70 (D.C. Cir. 1984). *Martin*, 891 F.3d at 1344.

The plurality seems to suggest that the Federal Circuit's embrace of the *TRAC* standard for assessing agency delay undercuts commonality. *See ante* at 10-11; *see also ante* at 15 (Davis, C.J., concurring). This is not so. It may be that the adoption of the *TRAC* standard in place of the one this Court used in the past will have an effect on the substantive outcome of the petitioners' claims.

reason for delay in all cases as part of a determination of whether such delay is unreasonable. If that were the case, the claim is far closer to *Wal-Mart* calling commonality into question. Of course, given the unexplored nature of the standard *Martin* adopted for assessing VA delays, one could still argue that there are common questions. However, I leave that issue for another day.

[55] Such claims of systemic constitutional harm have often been resolved in class action proceedings both before and after *Wal-Mart*. *See, e.g., Brown v. Plata*, 563 U.S. 493 (2011) (Eighth Amendment claims concerning prison overcrowding); *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) (Eighth Amendment claims concerning systemic deficiencies in prison provision of medical and dental care); *Blankenship v. Sec'y of HEW*, 587 F.2d 329 (6th Cir. 1978) (constitutional and statutory claims concerning delays in receiving hearing before the Social Security Administration); *Brown v. Guiliani*, 158 F.R.D. 251 (E.D.N.Y. 1994) (in addition to statutory claims, allegations of due process violations concerning timely processing of applications for public benefits).

[56] As with constitutional claims, courts have also certified classes in the context of claims of systemic violations of statutory rights both before and after *Wal-Mart*. *See, e.g., DL v. D.C.*, 860 F.3d 713 (D.C. Cir. 2017) (claims concerning violations of, among other things, the Individuals with Disabilities in Education Act and the Rehabilitation Act); *Blankenship*, 587 F.2d at 329; *Brown*, 158 F.R.D. at 251.

[57] While the petitioners in *Martin* also raised constitutional claims, the Federal Circuit declined to address them. *Id.* at 1348-49.

But to reach that substantive outcome, the Court will need to address many questions about how this standard applies. For example, how does the standard apply in the context of a claim, such as the petitioners' here, that delay on an aggregate basis is simply too great. *Martin* did not purport to have resolved those questions.

The critical thing about all these questions (both as to the Constitution and the statute) is that they are the same for every person who is a member of the class. Just as the boats in the pool will rise or fall all at once if we can affect the water level, the answers to these questions will make the petitioners' claims rise or fall *together*. The class members will win or lose once we have an answer. And it makes no difference whatsoever under Rule 23(a)(2) whether the answer leads to a win for all or a loss for all. The key point—the one at the core of commonality—is that the answer is for *all*. *See Amgen*, 568 U.S. at 460 (noting in a securities fraud case that, on the issue of materiality, "the class is entirely cohesive: It will prevail or fail in unison.").

*Wal-Mart* itself is not to the contrary. In fact, it actually reinforces why the scenario the Court confronts here presents common questions. *Wal-Mart* concerned claims by female employees that Wal-Mart unlawfully discriminated against them on the basis of sex, including denying equal pay and promotion opportunities. 564 U.S. at 343. The *Wal-Mart* plaintiffs based their claims on Title VII of the Civil Rights Act of 1964. *Id*. The Supreme Court determined that these allegations did not create a common question under Rule 23(a)(2). *Id*. at 359.

The critical point is why there was no commonality. In the context of employment discrimination claims, there was no question that, when the Supreme Court announced its decision, the reasons for employment actions mattered in terms of their legality. *See id*. at 352 (noting that "the crux of the inquiry [concerning plaintiffs' unlawful employment discrimination claims] is 'the reason for a particular employment decision'" (quoting *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984))). The plaintiffs in *Wal-Mart* did not have an absolute and unqualified right to be promoted. They merely had a right to not be passed over for promotion for an unlawful reason or otherwise treated differently than their male coworkers.[58] The facts in *Wal-Mart* did not provide for a common question because Wal-Mart had a decentralized process for making the relevant decisions. *Id*. at 353-60. And because Wal-Mart did not have a centralized process for making promotion and pay decisions, there was no question that could drive resolution of the class members' claims overall.

But that is not the situation here. Every—I stress, every—member of the putative class has a constitutionally protected right to procedural due process with respect to their benefits application. *Cushman*, 576 F.3d at 128. And every member of the class has the right to seek the Court's assistance to compel the Secretary to take action unreasonably delayed. 38 U.S.C.

---

[58] The Secretary misses the importance of the difference between an area of the law in which the reasons for actions matter—such as employment discrimination law in *Wal-Mart*—and the petitioners' claims here that some quantum of delay is simply too long, period. Thus, the Secretary's response to the request for class certification often does not address the real thrust of the commonality argument. *See, e.g.,* Secretary's Response to Amended Pet. at 14 ("There are countless individual factors that determine the length of time it takes for a claim to work its way through the legacy appeals system, and there is not a single action or policy within the Secretary's unilateral control that could alleviate the delays therein."), 15 ("Here, there is simply no common cause for the total amount of time that passes during a legacy appeal and there can be no common answer as to whether a violation . . . occurred such that entitlement to a writ is clear and indisputable."). As I explain, the plurality makes the same error as the Secretary.

§ 7261(a)(2). Neither of these rights is tied to an individualized reason for deprivation or delay–or at least not so under clearly established law. This is the critical distinction between *Wal-Mart* and the petitioners' case that the plurality misses.

It does not matter that there is uncertainty about what the outer limit for constitutional adjudication might be, whether, in fact, the VA adjudication system imposes too great a risk of unconstitutional delay on claimants, or whether the 1-year delay is "unreasonable." These uncertainties are also questions that are common to the class. Is "too long" 1 year, 2 years, 20 years, or something else? Who knows at this stage? But what is certain is that those questions— collectively and individually—are common to the class. Again, their boats will rise or fall together based on the answer(s). That is all that is required under Rule 23(a)(2), its commonality principle, and *Wal-Mart*.

The plurality's reasoning is based on a flawed understanding of the petitioners' claims. The plurality insists that the petitioners must identify the causes for the delay to prevail. *See, e.g., ante* at 9. In framing the issue in that way, the plurality is able to make this case look like *Wal-Mart*, where the reasons for an action were dispositive.

The fundamental problem with the plurality's reasoning for rejecting commonality is that it is not based on the petitioners' theory of the case. Their theory is that there is a period of time that is simply too long for a claimant to wait for a decision. It appears that such a theory finds some support in existing law, at least tangentially. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985) (suggesting in the context of a post-deprivation hearing case that "[a]t some point, a delay in the post-termination hearing would become a constitutional violation"). But even if, in the end, this Court were to reject the legal theory petitioners advance and hold substantively that there is no absolute time within which an administrative adjudication must be completed, that too is a question common to the class. Every member of the class would lose.[59]

The plurality states that I have reframed the petitioner's claim because the petitioners have argued that 1 year is too long. *See ante* at 9 n.16. It is true that the petitioners have argued that the period that is too long under the Due Process Clause is 1 year. But that argument does not undercut the commonality that exists with respect to the constitutional question. Indeed, if anything it augments it.

To address the petitioners' constitutional claim, the Court would need to assess first whether there is an outer limit for Agency adjudication and second, if there is, whether the petitioners are correct that 1 year is too long. It may be that the answer to either the first or second question is no. But if that is the case, the answer would be the same for every member of the proposed class.

---

[59] This is not to say that the reason for delay would never matter. Certainly, if there were some "good" reasons for a slow process, for example, compliance with the duty to assist, that could be considered as part of the flexible balancing process used under the Due Process Clause. This appears to be what was done in *Federal Deposit Insurance Corp. v. Mallen*, 486 U.S. 230 (1988), which the plurality cites. The Supreme Court there considered reasons for delay as part of a *merits* determination, not as part of a *class certification* determination. The same would be true here because, had we reached the merits, the various reasons for delay could have been used in determining at what point to draw the constitutional line concerning how much delay is too much as an absolute matter.

In the end, I fear that what is really happening here is that the Court is—consciously or unconsciously—making constitutional and statutory rulings that have quite dramatic implications for the VA system without making it clear that it is doing so. We can debate whether the Constitution and/or the statutory scheme sets an outer limit on adjudicatory time and, if it does, what that limit is. That is a debate worth having and one that we, as Judges, should have. But today's decision masks that debate behind a veil of procedure. I like procedure as much as the next person—likely more. But procedure should never serve to implement a substantive result without open debate. We should have a full and open discussion about these incredibly difficult and important constitutional and statutory issues. The answers to these questions are not clear. But the one thing that is clear is that those answers—whatever they are—are common to the putative class. I believe the plurality is wrong in concluding they are not and, therefore, I respectfully dissent from its commonality conclusion.

### B. The proposed class satisfies the other rule 23(a) prerequisites.

Given its conclusion on commonality, the plurality had no need to consider the other prerequisites for class certification. Because I conclude that Rule 23(a)(2)'s commonality requirement is satisfied here, I will explain why the proposed class also satisfies the other parts of Rule 23(a).

### 1. Rule 23(a)(1)–Numerosity

Class action treatment is appropriate only so long as the proposed class is "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The Secretary concedes that the proposed class satisfies this requirement. *See* Secretary's Response to Amended Pet. at 11-12. I agree that the requirement is met because there are clearly thousands (most likely hundreds of thousands) of claimants who fit within the class definition. The proponent of the class need not establish the exact number of members. *See, e.g., Hinman v. M&M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008) ("[P]laintiffs are not required to allege the exact number or identity of the class members, and may make common sense assumptions in determining numerosity."). While there is no bright line rule that establishes numerosity, the class proposed in this action clearly satisfies that requirement under any standard. *See, e.g., Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (generally, fewer than 21 members are inadequate while more than 40 satisfy the numerosity requirement).

### 2. Rule 23(a)(3)–Typicality

Certification also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The central thrust of the typicality requirement is that a class representative's interests are substantially aligned with the interests of the absent class members. *See, e.g., Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006); *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994). In other words, the typicality requirement ensures that "in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996). As the United States Court of Appeals for the Sixth Circuit has colorfully stated, "[t]he

premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).

It is also clear that, while distinct, the typicality requirement overlaps with certain other Rule 23(a) characteristics. In particular, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157 n.13; *see also Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982) (same).[60] Given this merging, it is not surprising that the extensive analysis of commonality set out above provides a roadmap for why the typicality requirement is also satisfied here. In the typicality analysis, the key inquiry is framed as whether the class representatives' claims arise from the same course of conduct as the absent class members' claims and flow from the same legal theory. *See, e.g., In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992); *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). This is, in many respects, no different materially than asking whether there are common answers to questions that will drive the litigation.

Here, the typicality standard is satisfied in the same functional way as is the commonality requirement. The petitioners' claim is that the VA benefits system as designed and implemented leads to delays that are unlawful no matter the reason. Amended Pet. at ¶¶ 30-48. They have set the relevant period as the time between the filing of an NOD and a Board decision. *Id.* (and as clarified at oral argument). As the petitioners have framed them—the relevant inquiry for typicality—the named class representatives' claims arise from precisely the same course of conduct as do the claims of all the absent class members and all the claims rely on the same legal theory. This is all that is required for typicality. There is no question here that "as go[] the claim[s] of the named [petitioners], so go the claims of the class." *Sprague*, 133 F.3d at 399.

The Secretary's arguments to the contrary, *see* Secretary's Response to Amended Pet. at 18-22, fail for the same reason his commonality arguments do. Fundamentally, the arguments are all based on the premise that the reasons for VA delays are relevant to the petitioners' claims. But that is just not the case on the legal theories the petitioners advance. The class representatives satisfy the typicality requirement under Rule 23(a)(3).

---

[60] The typicality requirement also tends to merge with the adequacy-of-representation requirement under Rule 23(a)(4). *See, e.g., Falcon*, 457 U.S. at 157 n.13; *Weiss v. York Hosp.*, 745 F.2d 786, 809 (2d Cir. 1984). I discuss the adequacy of representation prong below.

### 3. Rule 23(a)(4)–Adequacy of Representation

Finally, a class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "The requirement of adequate representation is a creature of due process that exists in class actions and other representational lawsuits where parties stand in judgment on behalf of others." PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 1.05 cmt. c; *see* U.S. CONST., amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law."). Given the importance of the interest the adequacy-of-representation-requirement protects, class representatives are essentially treated as acting as fiduciaries with respect to the absent class members. *See Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987); *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1983); *see also* PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 1.04 cmt. a, Reporter's Notes.

Consistent with this fiduciary role, "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at 625; *see also Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) ("It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent."). A conflict sufficient to negate the adequacy of representation may not be "merely speculative or hypothetical." *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010). The conflict must be a fundamental conflict, and a conflict is "not fundamental when . . . all class members share common objectives and the same factual and legal positions [and] have the same interest in establishing liability." *Id*. So long as there is no such fundamental conflict, a "strong overlap of interests" is all that is required. PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 1.05 cmt. a, Reporter's Notes. Absent unusual circumstances, only one class representative must satisfy the adequacy requirement. *Grasty v. Amalgamated Clothing & Textile Workers Union, AFL-CIO, CLC*, 828 F.2d 123, 128 (3d Cir. 1987).

Here, the class representatives satisfy the adequacy-of-representation requirement of Rule 24(a)(4). The named petitioners and the class share the same claims both factually and legally. Again, those claims may not be legally sustainable as framed, but they are the same. There is no realistic suggestion of a conflict between any of the named petitioners and the class. There is also no indication that any named petitioner would be "antagonistic" toward the class. In sum, the facts show the named petitioners will be fiduciaries for the class. Thus, the petitioners satisfy the requirements of Rule 23(a)(4).

Although not directly called for by Rule 23(a)(4), the adequacy prong also historically included consideration of the adequacy of class counsel. *See, e.g., Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993). This is technically no longer the case today. "Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure, those questions have, since 2003, been governed by Rule 23(g)." *Sheinberg v. Sorensen,* 606 F.3d 130, 132 (3d Cir. 2010); *cf. Johnson v. Nextel Commc'ns., Inc.*, 293 F.R.D. 660, 672 (S.D.N.Y. 2013) ("Formerly an element of Rule 23(a)(4), this [adequacy-of-counsel] requirement is often still considered as part of the Court's 23(a)(4) adequacy analysis.").

Rule 23(g) provides a set of factors a court must consider when determining whether class counsel is adequate. FED. R. CIV. P. 23(g)(1)(A)(i)-(iv). The factors are counsel's (i) work done in investigating and developing the claims; (ii) experience in both class actions and the substantive claims at issue; (iii) relevant legal knowledge; and (iv) willingness to commit sufficient resources to prosecuting the action. The rule makes clear that a court is not limited to the specifically enumerated factors and "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(1)(B).

Proposed class counsel in this action are clearly adequate under Rule 23(g)'s standards. The proposed class counsel are (1) the law firm Simpson Thacher & Bartlett LLP (STB) and (2) the Veterans Legal Services Clinic, a part of the Jerome N. Franks Legal Services Organization at Yale Law School. (Yale-LSO). Counsel have done extensive work developing the claims at issue. The documents submitted in this Court and to the Federal Circuit make that apparent. Similarly, when the experience of STB and Yale-LSO are combined, the knowledge of class action and veterans law bases are covered. As is the requirement that counsel display "relevant legal knowledge." The commitment of these entities also suggests that they have and will continue to support the litigation with sufficient resources. Therefore, and considering that there are no other "matters pertinent to counsel[s'] ability to fairly and adequately represent the interests of the class," *id*., I would conclude counsel are adequate and formally appoint them to represent the class. *See* FED. R. CIV. P. 23(g)(1) ("Unless a statute provides otherwise, a court that certifies a class must appoint class counsel.").[61]

## C. The proposed class may be maintained under Rule 23(b)(2).

Rule 23(a) focuses on whether a class has the characteristics to justify aggregate treatment. But even if a group has those attributes, a class action is appropriate only if it serves a specific function. That is where Rule 23(b) comes into play. Rule 23 itself has three sub-parts, only one of which is relevant to proceedings before this Court.

Rule 23(b)(2) provides that a class action is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole." As the Supreme Court has explained, Rule 23(b)(2) requires that "a single injunction or declaratory judgment . . . provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. Thus, if there are class members who would not benefit from a class-wide injunction (or declaration), certification under Rule 23(b)(2) would not be appropriate. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018) (commenting, in action concerning claims for periodic bond hearings for certain people detained under the immigration laws, that because some members of the class may not be entitled to such hearings under the Constitution, certification under Rule 23(b)(2) might be inappropriate).

---

[61] The Secretary suggests that "it is unclear whether Petitioners' counsel are adequate representatives for the interest of the absentee class members." Secretary's Response to Amended Pet. at 24. The Secretary may disagree with the legal theory the petitioners advance, *see id.* at 24-25, but to argue that a prominent national law firm with extensive class action experience and Yale Law School are not "adequate" as counsel in this case is entirely frivolous.

None of this affects certification in this matter because, using Rule 23(b)(2) as a guide, should the class prevail on the merits, the very nature of the petitioners' claims means that every person in the class would be entitled to enforce an injunction. The claims here do not require an assessment of why there has been delay. Instead, all that is necessary is that there has been a certain magnitude of delay. So, any member of the class would by the nature of the class definition have experienced the delay and, therefore, would be entitled to enforce any injunction that might be entered based on the claims.

The plurality concludes that the proposed remedy–a direction to the Secretary to render a decision within 1 year of submission of an NOD–does not fall within the ambit of Rule 23(b)(2). *See ante* at 13. That conclusion is infected with the same defect that infects the plurality's commonality analysis. The plurality concludes that an order to the Secretary would have to "be individualized and tailored to the needs of individual veterans." *Ante* at 13. But that is so only if the reason for a delay matters on the *petitioners'* theory. Because it does not, the plurality's conclusion that Rule 23(b)(2) would not apply is erroneous.

As with his response to commonality, the Secretary similarly misapprehends the legal underpinning of the petitioners' claims by assuming one must know the reason for delay. As a result, his arguments concerning Rule 23(b)(2) often don't address the situation we actually face here. *See, e.g.*, Secretary's Response to Amended Pet. at 25 ("Put otherwise, Petitioners identify a common effect they wish to change, but do not identify a uniform cause therefor."). Making essentially the same mistake just in a different way, the Secretary asserts that certification under Rule 23(b)(2) is inappropriate because "[p]etitioners do not identify any specific act or refusal to act by the Secretary that could be 'enjoined or declared unlawful' for the entire class." *Id*. But this is not so. If the petitioners are correct that the delays in the current system are just too great, the order to the Secretary would be to ensure that class members not experience that level of delay. It would be up to the Secretary to determine how to comply. And the key here is that the order would apply to everyone in the class. Certification under Rule 23(b)(2) is entirely appropriate.[62]

---

[62] I would also hold that, using Rule 23(b)(2) as a guide, there is no need to allow class members the opportunity to "opt out" of the class. *See* FED. R. CIV. P. 23(c)(2) (providing for right to exclusion only in classes certified under Rule 23(b)(3)); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3d Cir. 1990) (a class certified under Rule 23(b)(2) generally does not require an opt out provision). This makes sense because the nature of the relief is indivisible in that it applies to every member of the class even if he or she opted out of the class. *See In re Allstate Ins. Co.*, 400 F.3d 505, 506 (7th Cir. 2005) (commenting that "[t]he thinking behind this distinction [concerning opt out] is that declaratory and injunctive relief will usually have the same effect on all members of the class as individual suits would."). I would also hold that while notice is not required to class members at certification, *see* FED. R. CIV. P. 23(c)(2)(A) (making notice in a (b)(2) action optional), notice should generally be provided. However, that notice need not be individualized in the sense that notice by publication on a website or through veterans service organizations would suffice. I would have directed the parties to prepare a notice in this case for the Court's approval.

D. Manageability and Precedential Decisions[63]

As I noted above, I would expressly overrule *Harrison*. However, I would not discard the concepts of manageability or the availability of precedential decisions that *Harrison* discussed in connection with the certification of a class. Rather, I would address these matters on a case-by-case basis when making an individualized determination whether a *particular* class should be certified. In this case, manageability concerns and the availability of precedential decisions do not counsel against using the class action procedure.

Turning first to manageability, there is little if anything in proceeding as a class in this case that would cause the matter to be any more or less manageable than addressing these claims in individual petitions. The questions the petitioners pose are almost entirely legal in nature. They assert that the VA benefits system causes (or places them in an unreasonable risk of suffering) harm because the delay they face is unreasonable and unconstitutional. *See* Amended Pet. at ¶¶ 30-48. The assessments of these claims are the same for each member of the class. Moreover, there does not appear to be the need for much, if any, "discovery," that is, information gathering. Even if there would be the need for some information gathering (for example, acquiring updated statistics concerning delays between different stages of the administrative appellate process), this discovery would not likely impose any meaningful burden on the parties or the Court. And in delay cases in particular, it appears the Federal Circuit has recognized that class resolution may, in fact, be the best means of proceeding. *See Ebanks*, 877 F.3d at 1040; *Monk*, 855 F.3d at 1320-21.

The availability of the option to issue a precedential decision also does not counsel against the use of a class action in this case. A precedential decision certainly binds VA. But a precedential decision does not give a person who is not a party to that case a right to enforce a decision without instituting a separate action. If that person were a certified class member, however, he or she would have an enforceable right subject to contempt.[64] Thus, an enforceable order makes a meaningful difference here. Once again, it also appears that the Federal Circuit would agree. *See Monk*, 855 F.3d at 1321 (commenting on the small number of precedential decisions of this Court and suggesting that the class action device would address this issue).

---

[63] Consideration of these factors in connection with class certification underscores why the Court should not adopt Rule 23 mechanically. The availability of precedential decisions would never apply to a United States District Court when deciding whether to certify a class. So, it makes sense that that issue is not contemplated in Rule 23. Manageability is a concern under Rule 23, but it is specifically limited to classes certified under Rule 23(b)(3). *See* FED. R. CIV. P. 23(b)(3)(D) (specifying that a consideration for certifying the claim is "the likely difficulties in managing a class action."). But manageability clearly matters at our Court given its appellate nature.

[64] This is not an abstract difference. For example, this Court held in a precedential decision that VA had inappropriately denied reimbursement for emergency care obtained outside the VA healthcare system. *Staab v. McDonald*, 28 Vet.App. 50 (2016). This was a significant decision, but VA did not even publish an interim final rule attempting to implement the decision until January 9, 2018. *See* 83 Fed. Reg. 974 (2018) (amending 38 C.F.R. § 17.1002(f)). *Staab* may have bound VA, but that certainly rings hollow for veterans who have received nothing in the 2 years that have passed since the Court's decision.

## IV. CONCLUSION

In many respects, I conclude where I began. This is a truly significant day for the Court. To that extent, I agree with Chief Judge Davis. *See ante* at 15 (Davis, C.J., concurring). We have held that the Court will use aggregate resolution procedures in appropriate cases initiated by a petition. This decision has been decades in coming and holds great promise a means to address systemic problems in the VA system. I wholeheartedly join the Court in this decision. I believe the Court, however, misses an opportunity by failing to certify this class. From that ultimate determination, I respectfully dissent.

GREENBERG, *Judge*, dissenting:

I.

I respectfully dissent entirely. "This petition raises important questions about how the Government carries out its obligations to our veterans." *Mathis v. Shulkin*, 137 S. Ct. 1994, 1994 (2017) (Sotomayor, J., dissenting). "[H]ow is it that an administrative agency may manufacture for itself or win from the courts a regime that . . . does nothing to assist, and much to impair, the interests of those the law says the agency is supposed to serve?" *Id.* at 1994 (Gorsuch, J., dissenting). The issue of systemic VA delay "is of much significance to many today and, respectfully, it is worthy of this Court's attention." *Id.*

Systemic delay at VA is admittedly a complex issue with multiple contributing factors. But "courts may not abdicate their role and deny any effective remedy" to victims of administrative delay simply "because the problem is difficult." *Blankenship v. Sec'y of HEW*, 587 F.2d 329, 336 (6th Cir. 1978) (Merritt, J.). Aggregate action is an appropriate remedy for claimants "seeking relief from delays in the administrative review process." *Barnett v. Bowen*, 794 F.2d 17, 22 (2d Cir. 1986) (Feinberg, J.). This Court has been commanded by Congress to "compel action of the Secretary unlawfully withheld or unreasonably delayed." 38 U.S.C. § 7261(a)(2).

Our jurisdiction to hear aggregate action and provide the appropriate remedy should have been part of our jurisdiction since Congress established an Article I court for veterans in 1988. *See* 28 U.S.C. § 1651; 38 U.S.C. §§ 7261(a)(2), 7264(a).

> Legal precepts tend to expand, inexorably and sometimes imperceptibly. This is so, at least in part, because a broadly-formulated legal principle is by its very nature applicable to a wide range of situations. In any particular case, advocacy impels each party to claim the benefit of a potentially applicable doctrine, and in the absence of countervailing principles, consistency leads courts to decide in accordance with the suggested rule. But as a doctrine travels beyond the circumstances which generated it, the reasons which gave rise to that doctrine grow more attenuated, and the court is progressively more likely to encounter off-setting policies not present in the original application.

*N.J. Ed. Ass'n v. Burke*, 579 F.2d 764, 765 (3d Cir. 1978) (Adams, J.).

Our Court wrongly applied the law. *See Lefkowitz v. Derwinski*, 1 Vet.App. 439, 440 (1991); *Monk v. McDonald*, No. 15-1280, 2015 WL 3407451, at *1 (U.S. Vet. App. May 27, 2015) (order), *rev'd and remanded sub nom. Monk v. Shulkin*, 855 F.3d 1312 (Fed. Cir. 2017) (Reyna, J.). "In cases involving benefits owed to veterans, Congress has created a scheme conferring exclusive jurisdiction over claims affecting veterans' benefits to some federal courts, while denying all other federal courts any jurisdiction over such claims." *Veterans for Common Sense v. Shinseki,* 678 F.3d 1013, 1020 (9th Cir. 2012) (en banc) (Bybee, J.). Limitations on our jurisdiction have been merely self-imposed. *See, e.g.*, *Mokal v. Derwinski*, 1 Vet.App. 12 (1990).

II.

We have been given direction, not discretion, to "use class actions to promote efficiency, consistency, and fairness in . . . decisions" through our authority to issue writs. *Monk,* 855 F.3d at 1321. "[T]he issue [of unreasonable delay in VA's first-come-first-served queue] seems best addressed in the class-action context, where the Court could consider class-wide relief." *Ebanks v. Shulkin,* 877 F.3d 1037, 1040 (Fed. Cir. 2017). The Court ignores this command, using unnecessary specificity to "slam the courthouse door against" the petitioner. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 159, 178 (1970) (Brennan, J., concurring in result and dissenting).

III.

"It is a general rule in equity, that all persons materially interested, either as plaintiffs or defendants in the subject matter of the bill ought to be made parties to the suit, however numerous they may be." *West v. Randall,* 29 F. Cas. 718, 721 (No. 17,424) (C.C.D. R.I. 1820). Class action "was an invention of equity . . . mothered by the practical necessity of providing a procedural device so that mere numbers would not disable large groups of individuals, united in interest, from enforcing their equitable rights nor grant them immunity from their equitable wrongs." *Montgomery Ward & Co. v. Langer,* 168 F.2d 182, 187 (8th Cir. 1948) (Sanborn, J.). "The comprehensiveness of . . . equitable jurisdiction is not denied or limited in the absence of a clear and valid legislative command.  Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). (Murphy, J.).

IV.

Rule 23 is a tempting minefield for the unwary. Its use as a *guide* creates another self-imposed barrier by the Court and simply demonstrates how quickly the Court can adjust its timidity and refuse to get on with it. Veterans are alleging a common delay in the adjudication of their claims at the Board level, yet today we debate whether there is *glue* connecting the claimants to each other and the system's fractured parts. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 377 (Ginsburg, J., dissenting) ("The dissimilarities approach leads the Court to train its attention on what distinguishes individual class members, rather than on what unites them." (internal quotation marks omitted)). The system is broken. We, the Court, must be the *glue*.

V.

Rather than adopting a rule to keep classes out, I believe we should have followed the excellent example of the Court of Federal Claims:

[t]he better road to follow, until we are clearer as to the shape of the class-suit needs in this court and the functioning of various class-suit devices, is to proceed on a case-by-case basis, gaining and evaluating experience as we study and decide the class-suit issues presented by individual, concrete cases coming up for resolution. If we ultimately adopt a general rule, it will be in the light of this *ad hoc* experience.

*Quinault Allottee Ass'n & Individual Allotteess v. United States.,* 453 F.2d 1272, 1276 (Fed. Cl. 1972).

Once a common problem has been presented to the Court, our inquiry regarding whether to certify a class should be limited to numerosity and the competence of counsel to properly represent the class. *See, e.g.*, *Rosinski v. Shulkin*, 29 Vet.App. 183, 194 (2018). (Greenberg, J., dissenting). Here, the Court has been petitioned to address unconstitutional systemic delay at the Board level of VA, and numerosity and counsel's competence are not in dispute.

The Court relies on *Wal-Mart* to justify its denial of class certification. *Wal-Mart* dealt with a class certification request for 1.5 million current and former Wal-Mart employees alleging sex-based discrimination in pay and promotion decisions, in violation of Title VII of the Civil Rights Act of 1964. 564 U.S. at 342. The validity of petitioners' claims depended on unlawful discriminatory intent by Wal-Mart and its management. *See* 42 U.S.C. § 2000e-1 *et seq*. Because the petitioners worked in thousands of stores under thousands of managers, the Supreme Court found that the petitioners failed to show "some glue holding the alleged *reasons*" for pay and promotion decisions together, making it "impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." 564 U.S. at 352 (emphasis in original). In essence, it was impossible to discern whether all class members suffered an actual injury under Title VII. The constitutional violations alleged in this case are wholly distinguishable. The alleged injury suffered by the class here is unconstitutional delay in adjudication. The class petition sought remedy for all veterans whose appeals had not been decided within 1 year of the date on which a Notice of Disagreement had been submitted. Unlike the *Wal-Mart* petitioners, the petitioners here make it eminently easy for the Court to determine whether any veteran has experienced the alleged injury of unconstitutional delay. *Wal-Mart* cannot and should not have been read to keep this class of veterans out of the Court.

VI.

Due process will never be afforded while the masses of veterans idle indefinitely in gridlock. "[A]t some point delay must ripen into deprivation, because otherwise a suit alleging deprivation would forever be premature." *Shroeder v. City of Chicago*, 927 F.2d 957, 960 (7th Cir. 1991) (Posner, J.); *see also Wright v. Califano*, 587 F.2d 345, 349 (7th Cir. 1978) (Wood, Jr., J.). The procedural framework for adjudicating claims must be sufficient for the "large majority" of a group of claims to be constitutionally adequate for all. *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 331 (1985) (Rehnquist, J.). The Secretary deflects much of the blame towards Congress for overburdening him with the duty to assist veterans. *See* Secretary's Response to October 2017 Court Order at 18-24. Congress has responded by creating various "lanes" for appeals. https://benefits.va.gov/benefits/appeals.asp (last visited Apr. 24, 2018). Yet, a wider road for veterans is only helpful if VA's sluggish bureaucracy is no longer at the wheel. "[M]any unfortunate and meritorious [veterans], whom Congress have justly thought proper objects of

mmediate relief, may suffer great distress, even by a short delay, and may be utterly ruined, by a long one." *Hayburn's Case*, 2 U.S. (2 Dall.) at 410, n. (1792) (Jay, C.J.). This favored class of claimants should be certified; no further analysis is necessary.

VII.

I "willingly acknowledge that, *in theory*, the political branches of our government are better positioned than are the courts to design the procedures necessary to save veterans' lives and to fulfill our country's obligation to care for those who have protected us. But that is only so if those governmental institutions are willing to do their job." *Veterans for Common Sense v. Shinseki¸* 644 F.3d 845, 850-51 (9th Cir. 2011) (Reinhardt, J) (emphasis added), *opinion vacated on reh'g en banc*, 678 F.3d 1013, (9th Cir. 2012). On average, it takes VA 1,094 days just to certify and docket an appeal, and more than 5 ½ years to adjudicate a claim after an NOD is filed. *See Martin v. O'Rourke*, 891 F.3d 1338, 1350 (Fed. Cir. 2018) (Moore, J., concurring). This is unconscionable. Not every veteran can afford to hire an attorney to file a petition for a writ of mandamus on his or her behalf. *See id*. Here, the only way to remedy systemic delay is to certify the class of affected veterans and to issue a writ granting the petitioner's requested relief because ultimately the delay at VA has amounted to the Secretary's refusal to act on the petitioners' claims. *United States ex rel. Miller v. Raum*, 135 U.S. 200, 204 (1890) (Bradley, J.) ("[W]hen such officers refuse to act at all in a case in which the law requires them to do so . . . a mandamus lies to compel them to act or to perform such ministerial duty."). "Given Congress's understandable decision to place a thumb on the scale in the veteran's favor," *Shinseki v. Sanders*, 556 U.S. 396, 416 (2009) (Souter, J, dissenting), there should be no question that the interest of these worthy claimants outweighs that of the Government, *see Mathews v. Eldridge,* 424 U.S. 319 (1976) (Powell, J.), and this deprivation affecting hundreds of thousands of veterans violates of due process. U.S. CONST. amend. V.

VIII.

In *Brown v. Plata*, the Supreme Court reviewed a three-judge panel's order that the State of California reduce its prison population from almost 200% of design capacity to 137.5%. 563 U.S. 493 (2011) (Kennedy, J.). The panel had consolidated two separate class actions challenging prisoners' inability to access adequate medical care; *Coleman v. Brown* involved a class of prisoners with serious mental disorders and *Plata* involved a class of prisoners with serious medical conditions. *Id*. at 503-04, 506-07. The district court in *Coleman* appointed a special master to oversee the development and implementation of a remedial plan; 12 years after his appointment, the special master reported that the state of mental health care was deteriorating because of prison population increases. *Id*. at 506-07. After California conceded that its health care failing violated its prisoners' Eighth Amendment rights, the district court in *Plata* ordered a remedial injunction, and when California failed to comply, appointed a receiver to oversee implementation; the receiver also reported that overcrowding prevented improvement in prison health care. *Id*. at 507. A three-judge panel was convened to oversee the consolidated cases and the panel ordered California to formulate a plan to reduce its prison population, submit its plan to the panel for approval, and implement the approved plan. *Id*. at 509-10. The Court declared that Federal courts "must not shrink from their obligation to 'enforce the constitutional rights of all persons.'" *Id*. at 511 (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (per curiam)). It upheld the court-mandated prison

population reduction as "necessary to remedy the violation of prisoners' constitutional rights." *Id*. at 502.

The point here is that where broad institutional problems impede constitutional rights, courts have stepped in to command broad remedies. *See*, *e.g.*, *Id*. at 502; *Blankenship*, 587 F.2d at 336 (ordering the Secretary of HEW to promulgate rules and regulations); *Henderson v. Graddick*, 641 F.Supp. 1192 (M.D. Ala. 1986) (per curiam) (behavior by the State's attorney general affecting gubernatorial primary elections justified the court ordering a new election). Here, the Court had an opportunity to address the entirely indefensible *program* of systemic and systematic VA delay. The Court's decision to limit class certification to those attacking a "specific practice or policy" means that the Court may treat individual examples of delay without even trying to remedy the fundamental problem–programmatic delay.

Therefore, I would appoint recall judges from this Court as special masters to ensure compliance with the Court's holding, beginning with oversight of Congress's recently enacted Veterans Appeals Improvement and Modernization Act of 2017, 115 Pub. L. No. 55, 131 Stat. 1105 (Aug. 23, 2017). Appointing recall judges would allow the Court to minimize additional expenditures. *See* 38 U.S.C. § 7296(c). I would provide notice to all affected veterans through publication on VA.gov and require immediate mailings to veterans to their addresses listed with VA. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (Jackson, J) (notice is constitutionally sufficient if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"). I would then allow VA and representatives of the class of veterans to attempt to reach a settlement on the maximum time VA has to adjudicate the claims of the class members; the Court would only provide a time limit in the event the parties could not come to an agreement. While I believe that this would be the least intrusive means of remedying the constitutional violation, *see, e.g.*, 18 U.S.C. § 3626, I would not rule out the possibility of creating a receivership if VA fails to comply with these necessary time constraints. *See Plata*, 563 U.S. at 516 ("When a Court attempts to remedy an entrenched constitutional violation through reform of a complex institution . . . it may be necessary in the ordinary course to issue multiple orders directing and adjusting ongoing remedial efforts.").

IX.

I agree with Justice Brennan, that "[d]issent for its own sake has no value . . . . However, where significant and deeply held disagreement exists, members of the Court have a responsibility to articulate it. . . . Unanimity is not in and of itself a judicial virtue. . . . Judges have no power to *declare* law. Courts *derive* legal principles and have a duty to explain *why* and *how* a given rule has come to be. . . . [Judges] are forced by a dissent to reconsider the fundamental questions and rethink the result . . . . In my judgment. . . the unique interpretive role of [our Court] with respect to the Constitution [and our authority] demands some flexibility with respect to the call of stare decisis. . . . [We should not be] captive to the anachronistic view of long-gone generations. . . . The right to dissent is one of the great and cherished freedoms by reasons of the excellent accident of our American births." William J. Brennan, *In Defense of Dissents*, 37 HASTINGS L.J. 427, 427-35 (1985) (emphasis in original).

For all these reasons, I respectfully dissent.